**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-4036

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TIMOTHY L. RITCHIE,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, District Judge. (1:15−cr−00500−RDB−1)

Argued: January 26, 2017                    Decided: May 30, 2017

Before TRAXLER, DIAZ, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Diaz wrote the opinion for the court, in which Judge Traxler and Judge Thacker joined except as to Part III.D. Judge Traxler wrote the opinion for the court as to Parts III.D and IV, in which Judge Thacker joined. Judge Diaz wrote a separate dissenting opinion as to Parts III.D and IV.

**ARGUED:** Jonathan Biran, BIRAN KELLY LLC, Baltimore, Maryland, for Appellant. Kathleen O'Connell Gavin, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

DIAZ, Circuit Judge, writing for the court except as to Parts III.D. and IV:

Timothy Ritchie was convicted of making a false statement in a matter within the jurisdiction of the executive branch of the federal government, in violation of 18 U.S.C. § 1001(a)(2). The district court sentenced Ritchie to twelve months and one day in prison and ordered him to pay $1,385,444.83 in restitution to Bank of America. Ritchie does not contest his conviction or prison sentence but appeals the district court's order of restitution.

Finding no error, a majority of the court affirms the district court's decision in its entirety.

I.

A.

The facts relevant to this appeal are these. Ritchie owned Richland Homes, Inc., through which he built, purchased, and sold homes in Maryland and elsewhere. In July 2005, Ritchie agreed to buy three lots of a parcel of real property in Maryland (the "Property"). John Davis, a real estate settlement agent employed by Allshore Title Services, LLC conducted the closing and prepared a settlement sheet known as the Housing and Urban Development Form 1 ("HUD-1 form").[1]

---

[1] A HUD-1 form is a settlement sheet "used to effectively inform buyers and sellers of settlement costs." J.A. 16. Completion of the HUD-1 form is required by the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.*, and must be used "at all real estate settlements involving loans provided by institutions . . . insured by the Federal Deposit Insurance Corporation." J.A. 16.

On the HUD-1 form, Ritchie was named as "Borrower," and the line for "Cash from Borrower" listed a figure of $1,153,937.23. Ritchie, however, did not actually bring any funds to the closing, and both Ritchie and Davis knew that the HUD-1 form falsely reflected otherwise. The HUD-1 form was sent to Countrywide Bank which in turn wired $2,445,102 to Allshore to fund the settlement.

Ritchie defaulted on this mortgage in 2007. Bank of America purchased Countrywide in 2008, and subsequently foreclosed on the Property. In the foreclosure proceedings, Bank of America filed an Affidavit of Compliance asserting that the outstanding principal balance on Ritchie's loan was $2,491,444.83. In May 2015, Bank of America sold the Property at a public sale for $1,106,000.

Ritchie pleaded guilty to making a false statement in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development ("HUD"). As set out in the plea agreement, the district court was free to order restitution for the full amount of the actual, total loss caused by Ritchie's offense. The plea agreement identified the following as possible bases for restitution: (1) the Victim and Witness Protection Act of 1982 ("VWPA"), 18 U.S.C. § 3663; (2) the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A; or, (3) as a condition of supervised release, pursuant to 18 U.S.C. §§ 3563(b)(2) and 3583(d). The government contended that the court could order restitution in the amount of "at least $454,000." J.A. 13. Ritchie maintained, however, that restitution was not appropriate, and he reserved the right to appeal any order of restitution.

3

B.

Following Ritchie's plea, a probation officer prepared a Presentence Report ("PSR"), which set forth Ritchie's personal and financial history and calculated his advisory Guidelines range. The PSR also concluded that the MVRA applied to Ritchie's offense and that "restitution could be ordered . . . should the Court find that there was a loss in the case." J.A. 318. Ritchie did not object to the PSR.

The parties thereafter filed sentencing memoranda. As relevant here, Ritchie claimed that the MVRA did not apply because his offense of conviction was not "an offense against property" within the meaning of the MVRA, 18 U.S.C. § 3663A(c). Ritchie also objected to making restitution because the government could not show that Bank of America, as successor to Countrywide, was "directly and proximately harmed as a result" of Ritchie's offense. In Ritchie's view: (1) HUD was the sole "victim" of his offense; (2) Countrywide knew that Ritchie did not bring funds to the closing and did not rely on Ritchie's false statement on the HUD-1 when it disbursed the loan; and (3) Bank of America's eight-year delay in foreclosing and its neglect of the Property were superseding causes of the Bank's alleged loss.

In its sentencing memorandum, the government urged that Bank of America, as Countrywide's successor, was a "victim" under the MVRA and VWPA. The government also advised the court that "Bank of America [was] still in the process of compiling the final loss figure," for purposes of restitution. J.A. 45 n.2. One day before the sentencing hearing, the government filed Bank of America's final loss figure, calculated as more

4

than $1.5 million, along with its reply to Ritchie's sentencing memorandum. The district court deemed the submissions untimely, however, and declined to consider them.

At the sentencing hearing, the government offered the affidavit filed by Bank of America in the foreclosure proceeding affirming that the principal balance on Ritchie's outstanding loan was $2,491,444.83, and the recorded Deed of Substitute Trustee showing that the Property sold for $1,106,000. Based on these documents, the government contended that the loss caused by Ritchie's offense for purposes of calculating the Guidelines range was the difference between these figures, or $1,385,444.

In response, Ritchie argued that Countrywide had approved the loan before it received the false HUD-1 form and was also complicit in Ritchie's offense, and therefore suffered no loss. The district court rejected this argument, stating that "there is not a scintilla of evidence before me . . . that says there's any evidence that Countrywide knew full well there was not going to be any exchange of funds." J.A. 147. Ultimately, the court denied Ritchie's objection to the PSR, concluding that the actual loss to Bank of America for purposes of Ritchie's Guidelines calculation was $1,385,443.83.[2]

The district court then turned to the issue of restitution. Ritchie reiterated his view that Bank of America "inherit[ed]" Countrywide's "[un]clean hands" and knowledge of the falsified HUD-1 form, and was therefore not entitled to restitution. J.A. 174–75. Ritchie also contended that as "a matter of public record," Bank of America purchased

_____

[2] The district court concluded that the government nevertheless remained bound by paragraph 7(b) of the plea agreement, which limited the loss amount to less than $1 million.

5

"Countrywide's paper . . . at a steep discount," and that any restitution ordered would constitute a "windfall" because Bank of America paid "nowhere near $2,491,000" for Ritchie's loan. J.A. 175.

Although the district court stated that "[e]veryone knows" that Bank of America bought Countrywide's assets at a discount, it rejected Ritchie's arguments. J.A. 176. The court reasoned that "the precise loss resulting from this loan, resulting from [Ritchie's] clear lying on a document . . . [is] a very easy . . . arithmetic calculation." J.A. 177–78. The court applied the same calculation it arrived at for purposes of the Guidelines, and therefore ordered restitution in the amount of $1,385,444.83.

Ritchie timely noted this appeal.

## II.

"We review a district court's restitution order for abuse of discretion." *United States v. Freeman*, 741 F.3d 426, 431 (4th Cir. 2014). "Federal courts do not have the inherent authority to order restitution, but must rely on a statutory source to do so." *United States v. Davis*, 714 F.3d 809, 812 (4th Cir. 2013) (quotations marks omitted). As such, "[d]iscretion in ordering restitution 'is circumscribed by the procedural and substantive protections' of the statute authorizing restitution." *United States v. Leftwich*, 628 F.3d 665, 667 (4th Cir. 2010) (quoting *United States v. Henoud*, 81 F.3d 484, 487 (4th Cir. 1996)).

III.

We begin with a brief overview of the relevant statutory provisions. Outside of the probation context, restitution to victims of federal crimes is governed predominately by either the VWPA or the MVRA. *See United States v. Abdelbary*, 746 F.3d 570, 574 (4th Cir. 2014). The structure and language of the VWPA and MVRA are substantively the same, and the procedures for imposing and enforcing restitution pursuant to both statutes are set out in 18 U.S.C. § 3664. *See* 18 U.S.C. §§ 3663(d), 3663A(d).

The critical difference between the statutes rests in the sentencing court's discretion: The VWPA authorizes a sentencing court to impose restitution, but requires the court to "consider the financial resources of the defendant" in determining whether, and in what amount, to award restitution to victims of certain federal offenses. *See id.* § 3663(a)(1)(B)(i). By contrast, "the MVRA mandates restitution in the full amount of the victim's loss" caused by certain federal offenses, irrespective of a defendant's financial condition or ability to pay. *United States v. Dawkins*, 202 F.3d 711, 715–16 (4th Cir. 2000) (citing 18 U.S.C. § 3663A).

Ritchie lodges several challenges against the restitution order. First, he says that the district court abused its discretion by failing to identify the basis for ordering restitution. On the merits, Ritchie contends that a violation of 18 U.S.C. § 1001 is not an "offense against property" and that Bank of America is not a "victim" of Ritchie's offense within the meaning of the MVRA. Finally, he contends that the district court incorrectly calculated the amount of restitution due. We address each contention in turn.

7

A.

The district court did not state the basis for ordering restitution. Ritchie argues that this silence constitutes an abuse of discretion that requires remand. The government responds that the record is clear that the district court ordered restitution pursuant to the MVRA.[3] We agree with the government.

Where a district court fails to state the basis for ordering restitution, our precedent permits us to review the record to ascertain the ground relied on for the order. *See Freeman*, 741 F.3d at 431–32 (conducting a "close review of sentencing transcript[,] . . . judgment documents," and plea agreement to determine basis for restitution order after district court failed to identify statutory authority for its order at sentencing). In Ritchie's case, we have little trouble concluding that the district court imposed restitution under the MVRA.

To begin with, Ritchie stipulated in the plea agreement that the district court could order restitution under the MVRA, the VWPA, or as a condition of supervised release. And the PSR set forth explicitly that "[t]he provisions of the Mandatory Victim Restitution Act of 1996 apply to [Ritchie's] Title 18 offense," J.A. 311, and further that, "[p]ursuant to [the MVRA], restitution could be ordered in this case." J.A. 318. Equally

---

[3] We have in the past "admonish[ed] sentencing judges to specify in the record the precise statute under which they act in imposing restitution." *Leftwich*, 628 F.3d at 669 (quoting *United States v. Stuver*, 825 F.2d 73, 75 (4th Cir. 1988)). In the interest of "ensuring effective appellate review" of restitution orders, we again urge sentencing courts to identify on the record the basis for imposing restitution. *Id.* at 668.

8

illuminating, the PSR said nothing about the VWPA or the statutes governing conditions of supervised release under its discussion of restitution.

At the sentencing hearing, the district court confirmed that Ritchie and his lawyer had read the PSR and had no objections to it beyond the issue of actual loss for purposes of the Guidelines calculation. Thus, on this record evidence, specifically the PSR—duly adopted by the court and reviewed by Ritchie and his counsel—the district court clearly accepted the PSR's explicit finding that restitution could be ordered pursuant to the MVRA.

Ritchie's reliance on *Leftwich* to urge a different conclusion is unavailing. In *Leftwich*, we vacated a restitution order after the district court failed to identify the statutory authority under which it had acted and neglected to conform to the statutory requisites of either the VWPA or the MVRA before ordering restitution. 628 F.3d at 668–69. As was the case with Ritchie, Leftwich knew from the plea agreement that the court could order restitution pursuant to the VWPA or the MVRA. *Id.* at 666. However, neither the Presentence Report nor the district court's statements from the bench in *Leftwich* identified the statutory authority for the award. *Id.* at 667. Thus, with no record evidence available to clarify the district court's basis for ordering restitution, we reasoned that "[t]he failure of the district court in this case to specify the statute under which it ordered restitution prevents us from effectively determining whether the court properly exercised its discretion in fashioning that restitution order." *Id*. at 667.

Our concerns in *Leftwich* about appellate review of "the district court's exercise of discretion over the unknown" are not present here. *Id.* at 669. Rather, it's evident in this case that the district court ordered restitution pursuant to the MVRA.[4]

B.

Ritchie next contends that, if the district court imposed restitution under the MVRA, it erred because his offense of conviction is not an "offense against property" within the meaning of the restitution statute. To get there, Ritchie applies the "categorical approach," under which courts "focus[ ] solely on the elements of the offense of conviction, comparing those to the commonly understood elements of the generic offense identified in the federal statute." *United States v. Price*, 777 F.3d 700, 704 (4th Cir. 2015).

In Ritchie's view, the underlying facts and circumstances of his violation of 18 U.S.C. § 1001 are irrelevant; instead, for a conviction to qualify as "an offense against property" under the MVRA, the offense must "contain an element involving harm to or at least some sort of effect on property." Appellant's Br. at 25. The government responds that the statutory text of the MVRA bars use of the categorical approach, endorsing

---

[4] Ritchie also says that the district court failed to make the findings of fact required by the MVRA. *See* 18 U.S.C. § 3664(f)(1)–(2). We disagree. The district court satisfied § 3664(f)(2) when it crafted a restitution payment schedule allowing Ritchie to pay $250 per month after his release from custody. And as we've already noted, the district court adopted the PSR and its detailed findings concerning Ritchie's financial condition, *id.* § 3664(f)(2)(A), his projected earnings and other income, *id.* § 3664(f)(2)(B), and his financial obligations, *id.* § 3664(f)(2)(C). *See Dawkins*, 202 F.3d at 716 ("A court may comply with [the MVRA's] requirements by . . . adopting adequate proposed findings contained within a presentence report.").

instead a fact-based approach, or what is in essence the "circumstance-specific approach," under which we "focus[ ] on the circumstances underlying [Ritchie's] prior conviction, not [§ 1001's] elements." *United States v. Berry*, 814 F.3d 192, 196 (4th Cir. 2016). The government has the better of this argument.

Whether the MVRA applies to Ritchie's offense is an issue of statutory interpretation, which we consider de novo. *See United States v. Alalade*, 204 F.3d 536, 539–40 (4th Cir. 2000). Under the MVRA, a district court must impose restitution when the defendant has been convicted of:

> any offense—
> (A) that is—
>     (i) a crime of violence, as defined in [18 U.S.C. § 16];
>     (ii) *an offense against property under [Title 18]* . . . including any offense committed by fraud or deceit;
>     (iii) an offense described in [18 U.S.C. § 1365] (relating to tampering with consumer products); or
>     (iv) an offense under [18 U.S.C. § 670] (relating to theft of medical products); and
> (B) in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.

18 U.S.C. § 3663A(c)(1) (emphasis added).

By knowingly making a false statement on the HUD-1 form, Ritchie violated 18 U.S.C. § 1001, the elements of which are:

> (1) that the defendant made a false statement to a governmental agency or concealed a fact from it or used a false document knowing it to be false; (2) the defendant acted knowingly or willfully; and (3) the false statement or concealed fact or false document was material to a matter within the jurisdiction of the agency.

*United States v. Sarihifard*, 155 F.3d 301, 306 (4th Cir. 1998).

11

According to Ritchie, because "[n]o element of 18 U.SC. § 1001 requires that government property (or any other property) be involved in the 'matter' as to which the false statement is made," it follows that § 1001 "categorically is not an 'offense against property'" under subsection (c)(1)(A)(ii) of the MVRA, rendering restitution improper in his case. Appellant's Br. at 20. We, however, reject Ritchie's novel request to extend application of the categorical approach to this context. Our conclusion is bolstered by the number of circuits that have imposed—albeit, absent discussion—restitution under the MVRA based on violations of 18 U.S.C. § 1001. *See United States v. Wyss*, 744 F.3d 1214 (10th Cir. 2014); *United States v. Singletary*, 649 F.3d 1212 (11th Cir. 2011); *United States v. Peterson*, 538 F.3d 1064 (9th Cir. 2008); *United States v. Andrews*, 88 F. App'x 903 (6th Cir. 2004); *United States v. Scat, Inc.*, 40 F. App'x 310 (8th Cir. 2002).

As with any issue of statutory interpretation, "we begin by analyzing [the MVRA's] text." *Berry*, 814 F.3d at 196. The Supreme Court has instructed us to apply the categorical approach to statutory language that, when "read naturally[,] . . . refer[s] to a generic crime as *generally* committed." *Nijhawan v. Holder*, 557 U.S. 29, 34 (2009). Consistent with this premise, courts construe the sentence-enhancement provision of the Armed Criminal Career Act ("ACCA") defining a generic "violent felony" as, inter alia, a crime that "*has as an element* the use, attempted use, or threatened use of physical force," or "*is* burglary, arson, or extortion, [or] involves use of explosives," to require application of the elements-based categorical approach. 18 U.S.C. § 924(e)(2)(B)(i)–(ii) (emphasis added); *see*, *e.g.*, *Taylor v. United States*, 495 U.S. 575, 600–01 (1990) (interpreting ACCA's "has as an element" and "is burglary" language to support

12

inference that Congress intended courts to look only to the elements of the statute of the conviction, not to the facts of each defendant's conduct).

Here, we do not read the relevant text—"any offense . . . that is . . . an offense against property under [Title 18]"—to refer to a generic crime as generally committed. In that regard, we note that subsection (c)(1)(A)(ii) of the MVRA contains no language suggesting that courts look only to the elements of Title 18 statutory offenses, nor does it provide an illustrative list of property offenses that "must refer to generic crimes." *See Nijhawan*, 557 U.S. at 37 (approving application of categorical approach to 8 U.S.C. § 1101(a)(43)(A)'s list of the generic offenses of "murder, rape, or sexual abuse of a minor").

The structure of the statutory text also counsels against Ritchie's view. Subsection (c)(1)(A)(i) applies the MVRA to "a crime of violence, as defined in section 16," [5] and, under 18 U.S.C. § 16, we are required "to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to [the] crime." *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004). Subsection (c)(1)(A)(ii) contains no such modifying reference. We think this "contrasting terminology" shows that Congress intended subsection (c)(1)(A)(ii) "to cover a broader range of prior offenses" than those reached

---

[5] 18 U.S.C. § 16 provides that:
The term "crime of violence" means—
(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

by subsection (c)(1)(A)(i). *Price*, 777 F.3d at 708–09 (citing *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.")).

The purpose of the MVRA further underscores our decision to apply a fact-based approach to subsection (c)(1)(A)(ii). When it enacted the MVRA, Congress sought to build on the progress achieved by the discretionary VWPA in making "significant strides . . . toward a more victim-centered justice system," and identified the MVRA's primary goal: "to ensure that the loss to crime victims is recognized, and that they receive the restitution that they are due." S. Rep. No. 104-179, at 12–13 (1995). From this history, it's clear that Congress wanted to expand the number of identifiable victims entitled to full, mandatory restitution. Applying the categorical approach to the "offense against property" provision of the MVRA necessarily limits the pool of victims entitled to mandatory restitution, and illogically invites courts to disregard the actual consequences to an identifiable victim's property. Congress could not have intended to exclude from the broad, mandatory reach of the MVRA those unfortunate victims who suffer property loss as a result of an offense that doesn't contain as an element a reference to "property."

Our conclusion that the phrase "offense against property" requires an inquiry into the facts underlying the Title 18 offense is consistent with our prior directive to "account for practical considerations when determining whether to employ the categorical or circumstance-specific approach." *Berry*, 814 F.3d at 198. To be sure, application of the

14

circumstance-specific approach may "create 'daunting difficulties' for sentencing courts, tasking them with examining evidence to understand the specific circumstances of past convictions." *Id.* (quoting *Descamps v. United States*, 133 S. Ct. 2276, 2289 (2013)); *see also Moncrieffe v. Holder*, 133 S. Ct. 1678, 1690 (2013) ("The categorical approach serves 'practical' purposes: It promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."). But such concerns are absent here given that, under the MVRA, sentencing courts must impose restitution no later than 90 days after sentencing, and even upon a showing of good cause, a victim is prohibited from petitioning the court for an amended restitution order later than 60 days after discovery of further losses. *See* 18 U.S.C. § 3664(d)(5). Accordingly, we perceive no "daunting difficulties" for sentencing courts when conducting the "straightforward and objective" determination of applying the facts underlying a § 1001 conviction to the MVRA. *Berry*, 814 F.3d at 198.

We hold that the categorical approach has no role to play in determining whether a Title 18 offense is "an offense against property" that triggers mandatory restitution under the MVRA. And given the specific circumstances of Ritchie's § 1001 conviction, we have little trouble finding that his false statement on the HUD-1 form is an "offense against property" under the MVRA.

## C.

Ritchie's next quarrel with the restitution order is that Bank of America, as the successor lender to Countrywide, is not a "victim" under the MVRA. The MVRA defines "victim" as "a person directly and proximately harmed as a result of the

15

commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). The government bears the burden of proving by a preponderance of the evidence that the defendant's offense of conviction directly and proximately caused the harm to the victim. *Freeman*, 741 F.3d at 435; *see* 18 U.S.C. § 3664(e).

Ritchie's first point is that Bank of America is not a victim under the MVRA because the alleged neglect of the Property by the Bank and its predecessor Countrywide, along with the eight-year delay in selling it, are superseding causes of the harm suffered by the Bank. But Ritchie presented no evidence at the hearing to substantiate his claims of the lenders' neglect and delay. Indeed, Ritchie's counsel admitted as much during oral argument, maintaining instead that the government bears the burden to account for the Property's drop in value at foreclosure. We do not agree.

Adopting Ritchie's rule would, in our view, impermissibly add to the government's statutory burden under the MVRA. We think instead that the burden of showing that a victim delayed unreasonably in selling property (or otherwise neglected it) belongs with the defendant who seeks to avoid being tagged as the "proximate cause" of the loss in value of that property. *See* 18 U.S.C. § 3664(e) ("The burden of demonstrating such other matters [under the MVRA] as the court deems appropriate shall be upon the party designated by the court as justice requires."); *Robers v. United States*, 134 S. Ct. 1854, 1861 (2014) (Sotomayor, J., concurring) ("I would place on the defendant the burden to show—with evidence specific to the market at issue—that a victim delayed unreasonably in selling collateral . . . .").

16

Ritchie's other arguments fare no better.[6] He claims that Countrywide didn't rely on the fraudulent HUD-1 form to approve the loan because: (1) Countrywide knew that Ritchie would not actually be bringing money to the closing given that the transaction was a "non-arms' length deal," between Richland Homes as the "seller," and Ritchie as the "buyer," and (2) Countrywide approved the loan prior to receiving the false HUD-1 form.

These contentions are unpersuasive for a number of reasons. First, Ritchie stipulated that his false statement on the HUD-1 form was the first link in the causal chain that resulted in harm to Bank of America: In his plea agreement, Ritchie affirmed that "*[a]s a result of* [his false statement on the HUD-1 form], Ritchie derived approximately $2,445,102 from [Countrywide]." J.A. 17 (emphasis added). Second, the district court acted well within its discretion in crediting the government's evidence that Countrywide relied on the fraudulent HUD-1 form to provide Ritchie with a $2.44 million mortgage loan, including: (1) a CMD Quality Verification & Document Questionnaire completed by a Countrywide official one day before the closing, identifying "Rosemont," not Richland Homes, as the seller; (2) a Uniform Underwriting and Transmittal Summary completed by a Countrywide official one day after settlement indicating that Ritchie had "put[ ] down $1,000,000," J.A. 284; (3) Countrywide's

---

[6] We readily dispense with Ritchie's claim that HUD is the only "victim" of his § 1001 offense. For purposes of the MVRA, the "victims" of a fraud perpetrated against a federal agency are not limited to that agency alone. *See, e.g.*, *Andrews*, 88 F. App'x at 907 (awarding restitution under MVRA to employees who were "victims" of defendant who submitted false payroll forms for his employees pursuant to HUD-funded government contracts, in violation of 18 U.S.C. § 1001).

express instruction to its officials to review the HUD-1 form before issuing a loan; and (4) evidence that Countrywide issued funds on July 8, 2005, the day after Ritchie made the false statement.

On this record, the district court did not err when it determined that Ritchie's false statement directly and proximately caused harm to Bank of America. As a result, the Bank is a "victim" within the meaning of the MVRA.

TRAXLER, Circuit Judge, writing for the court in Parts III.D. and IV:

## D.

The district court also did not err in awarding restitution to Bank of America in the amount of $1,385,444.83. Bank of America acquired Countrywide Bank in its entirety and, therefore, is a successor entity that stands in the shoes of that now-defunct financial institution. As such, the district court correctly awarded restitution to Bank of America for the total, actual loss caused by Ritchie's criminal conduct.[7]

## 1.

Based upon a false representation on the HUD-1 form that created the illusion that Ritchie was contributing $1,153,937.23 towards the purchase of the collateral Property,

---

[7] Judges Traxler and Thacker concur in Judge Diaz's opinion in Parts I, II, III.A., III.B., and III.C., insofar as it holds that Ritchie's violation of 18 U.S.C. § 1001(a)(2) qualifies as "an offense against property" within the meaning of the MVRA, 18 U.S.C. § 3663A(c), that Bank of America is a victim of Ritchie's offense entitled to restitution under the MVRA, and that the district court imposed the order of restitution to Bank of America under the MVRA. We also concur in footnote 4, which rejects Ritchie's argument that the district court failed to make the findings of fact required by the MVRA.

18

Countrywide Bank lent Ritchie over $2.4 million. When Ritchie defaulted on his secured loan, the unpaid principal balance was $2,491,444.83.

Bank of America thereafter purchased Countrywide Bank. Although the precise details of the buy-out are not a part of the record, it is undisputed that Countrywide Bank ceased to exist as a separate financial institution. Thus, Bank of America did not merely buy Richie's loan or a group of loans that contained Ritchie's loan at any price – discount or full – on the secondary mortgage market. *See* J.A. 109 (agreeing that "Bank of America bought all the paper of Countrywide"); Appellant's Brief at 6 (same); J.A. 42 (referring to Bank of America as the "successor entity" to Countrywide); Appellant's Brief at 29-30 (same). Bank of America later foreclosed on the collateral Property, sold it for $1,106,000, and applied the funds to the outstanding balance of the loan. Accordingly, the total, actual loss of money caused by Ritchie's fraudulent scheme and remaining due to Bank of America at the time of his sentencing was at least $1,385,444.83.[8]

At the sentencing hearing, Ritchie did not take issue with the fact that the total, actual loss caused by his criminal offense was $1,385,444.83. Rather, he argued that Bank of America was not entitled to this amount because it was "a matter of public

---

[8] The Affidavit prepared by Bank of America actually reflected Ritchie's outstanding indebtedness to be $3,314,003.50, at the time of sentencing. In addition to the principal balance, Richie owed Bank of America $822,558.70 in accrued interest, late charges, tax disbursements, hazard insurance disbursements, property inspections and preservation costs, and other miscellaneous expenses. However, the Government only requested an order of restitution for $1,385,444.83.

19

record . . . that when Bank of America bought Countrywide's paper, they did so at a steep discount" and, therefore, that Ritchie's loan "would have been considered a distressed asset." J.A. 175. From that unsubstantiated premise, Ritchie argued that Bank of America was "actually seeking a windfall" because the Government had not shown "what Bank of America's basis [was] on [Ritchie's] loan, what their cost was." J.A. 175.

The district court disagreed, finding that Bank of America was entitled to the full amount of the actual loss caused by Ritchie's offense:  the outstanding principal balance of the loan that had been extended to Ritchie ($2,491,444.83), minus the amount of the loan that had been returned in the foreclosure sale ($1,106,000).  Accordingly, the court ordered restitution in the requested amount of $1,385,444.83.

2.

Relying upon a number of precedents from other circuit courts of appeal, Richie argues that the district court clearly erred by not limiting the restitution award to the amount that Bank of America paid to "purchase" Ritchie's mortgage, minus the amount that it recovered at the foreclosure sale.[9]  To do otherwise, Ritchie argues, would be to

---

[9] Specifically, these courts have adopted a hard-and-fast rule that a successor lender or downstream purchaser of a mortgage on the secondary mortgage market is limited to a restitution award in the amount the purchasing bank paid for the loan, minus the amount the purchasing bank received in the foreclosure sale. *See, e.g.*, *United States v. Martin*, 803 F.3d 581, 595 (11th Cir. 2015); *United States v. Howard*, 784 F.3d 745, 751 (10th Cir. 2015); *United States v. Beacham*, 774 F.3d 267, 278–79 (5th Cir. 2014); *United States v. Chaika*, 695 F.3d 741, 748 (8th Cir. 2012); *United States v. Yeung*, 672 F.3d 594, 602 (9th Cir. 2012), *abrogated on other grounds by Robers v. United States*, 134 S. Ct. 1854, 1857 (2014).

20

grant Bank of America an impermissible windfall by compensating it for actual losses that it did not sustain.

Our colleague agrees, and would hold that the restitution calculation must begin with the amount that Bank of America paid for Ritchie's mortgage. He would do this even though Bank of America acquired the now-defunct Countrywide Bank, and not just Ritchie's loan via a purchase on the secondary market, and notwithstanding the thorny evidentiary problem that the Government would face in trying to prove the amount that should be attributed to Ritchie's loan for its part in the much larger acquisition of Countrywide Bank as an entity. According to our colleague, this distinction makes no difference when calculating the amount of restitution due under the MVRA.

We disagree. Calculations of the appropriate amount of restitution will always rest upon the unique circumstances of each case, and this is particularly true in the mortgage foreclosure context where secured loans and property rights change hands for different reasons and upon different terms. Accordingly, we decline to adopt the hard-and-fast rule that our sister circuits have followed and extend it to the successor entity situation that is before us. For the reasons set forth below, we hold that the district court did not clearly err in calculating the amount of restitution owed to Bank of America.

3.

a.

At its core, the MVRA requires "offenders to restore property lost by their victims as a result of the crime." *Robers v. United States,* 134 S. Ct. 1854, 1856 (2014). Its goals are both compensatory and penal, requiring the defendant to return his "ill-gotten gains to

21

the victims of his crimes." *United States v. Puentes,* 803 F.3d 597, 609 (11th Cir. 2015);

*see also Paroline v. United States*, 134 S. Ct. 1710, 1726 (2014) ("The primary goal of

restitution is remedial or compensatory, but it also serves punitive purposes.") (citation

omitted).

The base formula for calculating the amount of restitution that a defendant is

required to pay to his victims is set forth in § 3663A to Title 18: "Notwithstanding any

other provision of law," the sentencing court "shall order . . . that the defendant make

restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). "[I]n the case of an

offense resulting in damage to or loss or destruction of *property* of a victim of the

offense," such as here, the court "shall require" that the defendant:

> (A) return the property to the owner of the property or someone designated
> by the owner; or
>
> (B) if return of the property under subparagraph (A) is impossible,
> impracticable, or inadequate, pay an amount equal to—
>> (i) the greater of—
>>
>>> (I) the value of the property on the date of the damage, loss,
>>> or destruction; or
>>>
>>> (II) the value of the property on the date of sentencing, less
>>
>> (ii) the value (as of the date the property is returned) of any part of
>> the property that is returned

18 U.S.C. § 3663A(b)(1) (emphasis added). In other words, the defendant must return all

of the property he stole to the victim. And if he cannot, he must pay the victim an

amount equal to the value of the unreturned property.

22

Unlike in the case of a non-fungible item of property, such as jewelry, it is "awkward" to grapple with the concept of the term "property" in the context of a fraudulently obtained loan. *Robers*, 134 S. Ct. at 1857-58. But we are not without guidance. "[T]he 'property' that was 'damage[d],' 'los[t],' or 'destr[oyed]' as a result of the crime" is the money that was lent to the borrower. *Id.* at 1857 (quoting 18 U.S.C. § 3663A(b)(1)). "And, if the 'property' that was damage[d], los[t], or destr[oyed] was the money, then 'the property . . . returned' must also be the money." *Id.* "Money being fungible, however, 'the property . . . returned' need not be the very same bills or checks." *Id.* (internal citations omitted). Similarly, "the phrase 'any part of the property . . . returned'" for purposes of 3663A(b)(1)(B)(ii), also "refers to the property the banks lost, namely, the money they lent to [the defendant], and not to the collateral the banks received" to secure the loan. *Id.*[10]

Accordingly, the proper restitution award due in the context of a fraudulent mortgage transaction *is* a relatively simple calculation. The "owner of the property" that was lost (*i.e.,* the money lent), or the person "designated by the owner" to receive it, is entitled to a restitution award that is equivalent to the outstanding amount of the money that remains due under the fraudulently obtained loan. 18 U.S.C. § 3663A(b)(1)(A).

---

[10] Thus, in *Robers*, the Supreme Court held that "no 'part of the property' is 'returned' to the victim until the collateral [securing a loan] is sold and the victim receives money from the sale." *Robers*, 134 S. Ct. at 1856. "The import of [the] holding is that a sentencing court must reduce the restitution amount [due the victim lender] by the amount of money the victim received in selling the collateral, not the value of the collateral when the victim received it." *Id.*

And because the money that was lent to the borrower is the "property" under the MVRA, that amount necessarily takes into account any portion of the money that was "returned" to the owner or its designee when the collateral that secured the loan was sold. § 3663A(b)(1)(B)(ii); *see Robers,* 134 S. Ct. at 1858.

Whereas § 3663A tells us how to compute the base restitution amount due to the owner or its designee, § 3664 of Title 18 makes clear that the defendant is expected from the outset to repay *all* of the actual losses that he caused, but no more. It is these "[o]ther provisions of the statute [that] allow the court to avoid an undercompensation or a windfall" to the victim, while ensuring that the defendant is not unfairly punished for his crime by having to pay back *more* money than he stole. *Robers*, 134 S. Ct. at 1858.

Initially, the statute requires the district court to calculate the "full amount of each victim's losses" caused by the defendant's illegal conduct, regardless of the financial resources or condition of the defendant, 18 U.S.C. § 3664(f)(1)(A), or the fact that the victim has received or may receive compensation from another source (such as insurance), s*ee* 18 U.S.C. §§ 3664(f)(1)(B). These provisions "evince[] congressional intent that defendants . . . initially be ordered to pay restitution in the full amount of each victim's loss." *United States v. Alalade*, 204 F.3d 536, 540 (4th Cir. 2000). However, the statute also provides for credits against the offender's restitution obligation to prevent a victim from obtaining a windfall. *See Robers*, 134 S. Ct. at 1858 (internal quotation marks and alteration omitted). For example, if a victim *has* received compensation from other sources for the same loss, the court will order that this portion of the restitution be paid to the person or entity that provided the compensation instead of to the victim. *See*

24

18 U.S.C. § 3664(j)(1). The defendant is also entitled to an offset for any amount that the victim recovered as compensatory damages for the same loss in federal or state civil proceedings. *See* 18 U.S.C. § 3664(j)(2)(A), (B).

In like fashion, the MVRA contains provisions to ensure that the defendant not escape his obligation to return his ill-gotten gains to the "the owner of the property or someone designated by the owner" and, thereby, receive a windfall of his own. For example, if the defendant "receives substantial resources from any source, including inheritance, settlement, or other judgment, during a period of incarceration, [he] shall be required to apply the value of such resources to any restitution . . . still owed." 18 U.S.C. § 3664(n). Similarly, the defendant must report "any material change in [his] economic circumstances that might affect [his] ability to pay restitution," at which time the court may "adjust the payment schedule, or require immediate payment in full, as the interests of justice require." 18 U.S.C. § 3664(k).

Construed in its entirety, therefore, it is clear that the compensatory goal of the MVRA fully complements its punitive purposes. It benefits victims of crimes by affording them a less complicated and costly route "to recover [their] damages in a summary proceeding ancillary to a criminal prosecution." *United States v. Bach*, 172 F.3d 520, 523 (7th Cir. 1999). And, "from [the] defrauder's standpoint," it makes little difference "whether he is ordered to make good his victims' losses in a tort suit or in the sentencing phase of a criminal prosecution." *Id.* It does not allow a court to grant a windfall to the victim, and thereby unfairly punish a defendant by requiring him to pay

25

back more money than he stole. But just as the victim is not entitled to a windfall, the defendant is not entitled to a bailout. [11]

b.

As noted above, Ritchie made a fraudulent representation to Countrywide Bank in order to secure the loan. As a result, Countrywide Bank lent Ritchie $2,445,102 to fund his purchase of the collateral Property. The property that was lost for purposes of the MVRA, however, was "the money lent" to Ritchie. *Robers*, 134 S. Ct. at 1856. And because "[m]oney [is] fungible," *id.* at 1857, the MVRA required an order that Ritchie "return the [money] to the owner of the property or someone designated by the owner" to receive it, 18 U.S.C. § 3663A(b)(1)(A).

---

[11] For the same reasons, a restitution award may not be calculated based upon a defendant's *intended* losses, but must be grounded in the total, actual losses that were realized by the victims. *See e.g., United States v. Beydoun*, 469 F.3d 102, 107–08 (5th Cir. 2006) (District court erred in awarding restitution to the victim of a counterfeit goods scheme that included lost profits for goods that the defendant had not yet placed into commerce for sale in competition with the victim's products. Because the victim had not actually lost profits to the counterfeit goods, the restitution award granted the victim a windfall and unduly punished the defendant by making him pay for monetary losses that he intended to cause but failed to accomplish.); *see also United States v. Boccagna*, 450 F.3d 107, 117–20 (2d Cir. 2006) (District court erred in calculating a restitution award to HUD based upon the amount that HUD paid original lender/victims of defendant's criminal actions minus the amount for which HUD sold the properties where HUD, albeit consistent with its mission to ensure that the properties remained available for low income housing, made the choice to sell the properties to the City of New York for nominal prices instead of for their "fair market value" in the market.). Here, in contrast, there is no dispute that the total, actual monetary losses caused by Ritchie's criminal offense, minus the amounts returned, are $1,385,444.83. The restitution award does not include unrealized intended losses. Nor did Bank of America sell the collateral Property for less than its fair market value.

26

Although we do not know the specifics of Bank of America's acquisition of Countrywide Bank, we know enough. Ritchie has never disputed that Bank of America purchased Countrywide Bank and, thereby, acquired all of Countrywide Bank's assets – including, as odd as it may sound, all rights to the fraudulently obtained loan. Bank of America is not a successor or downstream purchaser of Ritchie's loan. Bank of America is the successor to the defrauded entity, the sole remaining victim of Ritchie's illegal conduct, and the only entity with the legal right to receive the money that was lost as a result of Ritchie's crime.

Similarly, Ritchie's obligation to repay the money he stole did not end when Countrywide Bank ceased to exist, and this is true whether we view that obligation as having arisen via Countrywide Bank's assignment of the legal right to repayment to Bank of America or by virtue of Bank of America's acquisition of that right along with the other assets of Countrywide Bank. The district court's order of restitution serves the compensatory purpose of the MVRA and imposes no impermissible punishment upon Ritchie. Bank of America enjoys no windfall from an order of restitution that requires Ritchie to pay back or "return" all of the money that he stole, and that Bank of America has the sole and legal right to receive. Indeed, if we were to accept Ritchie's argument, the opposite would be true. Ritchie would become the fortuitous beneficiary of Countrywide Bank's now-defunct status, absolved of his *mandatory* obligation to make restitution for all of the loss that he caused to his victims.

The total, actual loss occasioned by Ritchie's criminal activities *prior* to foreclosure was $2,491,444.83. Because Bank of America sold the collateral Property

27

securing the loan, $1,106,000 of the money was returned to the victim, leaving $1,385,444.23 in money or "property" that remained to be returned via a restitution order under the MVRA.

As the Supreme Court recognized in *Robers*, it is "awkward" to apply the MVRA in the context of fraudulent loan transactions, particularly in light of the fact that it is common in the financial industry for mortgage rights, and the rights to the collateral securing such loans, to changes hands for a variety of reasons. Nevertheless, whether one views Bank of America as standing in the shoes of Countrywide Bank by virtue of its wholesale purchase of that entity, or as the entity effectively designated by the original owner of the money (Countrywide) to receive it when it is returned, we have no trouble concluding that the district court did not abuse its discretion in imposing a restitution award in the amount of $1,385,444.23, payable to Bank of America.

4.

Finally, we acknowledge that our decision is in conflict with the Ninth Circuit's decision in *United States v. Luis*, 765 F.3d 1061 (9th Cir. 2014). There, the defendant was convicted of two criminal counts arising out his purchase of two parcels of real property with fraudulent loans obtained from two different banks.

With regard to the first piece of property (the Rancho Santa Fe property), the defendant obtained two loans from Washington Mutual Bank. Washington Mutual Bank was thereafter purchased by JP Morgan Chase Bank. Because Chase "did not buy simply one loan or a package of loans from Washington Mutual," but rather "acquired all assets and liabilities of Washington Mutual," the district court granted Chase a restitution award

28

in the full amount of the total, actual loss occasioned by the defendant's fraudulent acts – the unpaid principal balance on the first mortgage acquired by Chase, minus the amount Chase realized at the property foreclosure sale, plus the unpaid principal balance on the second mortgage. *United States v. Luis*, 2013 WL 149726 at *6 (S. D. Calif., Jan. 14, 2013). The Ninth Circuit reversed, holding in effect that there was no difference between Chase and a "successor" or "discount" purchaser that pays for a distressed loan on the secondary market. *See Luis*, 765 F.3d at 1067. Suffice it to say that, for the reasons set forth above, we agree with the view of the district court in *Luis* that this distinction does make a difference, and we decline to follow the Ninth Circuit's contrary reasoning.

With regard to the second parcel of property at issue in *Luis* (the Palomar Mountain property), the defendant obtained two loans from CitiGroup. After the defendant defaulted on these loans, Citibank (the originating lender) did not foreclose on the property; rather, it sold the first mortgage to Ranier Partners/Selene (the discount purchaser) as part of an $88 million sale of distressed mortgages, and wrote off the second mortgage. Ranier was not referenced as a victim for purposes of restitution, perhaps because it had purchased the mortgage at a steep discount and held the collateral. However, Citibank, being still in existence and having sustained a significant loss of money when it sold the first mortgage to Ranier, was awarded restitution based upon the principal amount of the mortgage loan outstanding when it was sold to Ranier, minus the amount that Ranier paid Citibank for it, plus the unpaid principal balance on the second mortgage. *See id.* at 1064, 1068; *see also Yeung*, 672 F.3d at 601 (noting that a "direct lender's losses may also be reduced by amounts recouped from resale of the loan").

29

Thus, *Luis* indicates that, depending upon the nature of the specific bank-to-bank transaction between *existing* entities (and perhaps unique state laws that govern such transactions), there may well be *two* victims that remain standing in such situations, each entitled to a share of the total, actual loss remaining.

Here, we need not definitively resolve the question of whether the discount, downstream or successor purchaser of a mortgage should, in all circumstances, be limited to a restitution calculation that begins with the amount that it paid for the loan at issue or the book of loans that contain it. We simply note that the compensatory and punitive goals of the MVRA that guide us in this case are constant, and we recognize that the precise contractual arrangements between banking entities may well affect which entity is entitled to receive the money that the MVRA *requires* the defendant to repay to the originating lender or to its designee. These are factual matters to be considered in the first instance by the district courts. In this case, there is no question that Bank of America is entitled to it all.

IV.

For the foregoing reasons, we hold that the district court did not err in holding that Bank of America was entitled to an award of restitution in the amount of $1,385,444.83. Accordingly, we affirm the district court's decision in its entirety.

AFFIRMED

DIAZ, Circuit Judge, dissenting as to Parts III.D. and IV:

The court holds today that we know enough to affirm the award of restitution to Bank of America in the amount of $1,385,444.83—the principal balance remaining on Ritchie's mortgage with Countrywide after the property's foreclosure sale. I disagree. On the limited record before us, Bank of America, as a successor lender, stands to gain an impermissible "windfall" from the restitution award. Because I would calculate the amount of restitution due to Bank of America by starting with the amount it paid to obtain Ritchie's mortgage loan, I respectfully dissent.

In writing separately, I am mindful of the *primary* goal of ordering restitution under the MVRA: "to restore a victim, to the extent money can do so, to the position [the victim] occupied before sustaining injury." *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006). The statutory language of the MVRA reflects this compensatory goal, as the statute "does not permit restitution awards to exceed a victim's loss." *United States v. Beydoun*, 469 F.3d 102, 107 (5th Cir. 2006); *see* 18 U.S.C. § 3664(f)(1)(A) (emphasis added) ("[T]he court shall order restitution to each victim in the *full amount* of each victim's losses . . . ."). As such, a "court may not award the victim a windfall" under the MVRA. *Beydoun*, 469 F.3d at 107.

Consistent with the MVRA's restorative purpose, virtually all of the circuits to have considered the question hold that a successor lender (as I believe Bank of America to be here) is entitled to restitution under the MVRA only for the amount it actually paid for the note, not the outstanding principal balance of the note. *See United States v. Martin*, 803 F.3d 581, 595 (11th Cir. 2015) ("[A] successor lender's restitution award

31

should turn on how much it paid to acquire the mortgage."); *United States v. Howard*, 784 F.3d 745, 751 (10th Cir. 2015) (paying downstream lender restitution calculated using the amount of original mortgage note "would create an unlawful windfall for the downstream lender"); *United States v. Beacham*, 774 F.3d 267, 2779 (5th Cir. 2014) ("[T]he district court abused its discretion by using the original loan amounts to calculate restitution" for successor lender.); *United States v. Chaika*, 695 F.3d 741, 748 (8th Cir. 2012) (Whether or not mortgages "were sold by the initial lender in a secondary mortgage market . . . greatly alters the determination of the victims' actual loss."); *United States v. Yeung*, 672 F.3d 594, 602 (9th Cir. 2012) ("To calculate a victim's restitution award using the outstanding principal balance of the loan, if the victim only paid a fraction of that amount to obtain the loan on the secondary market, would cause the victim to receive an amount exceeding its actual losses.") *abrogated on other grounds by Robers*, 134 S. Ct. 1854. *But see United States v. Rivernider*, 828 F.3d 91, 116 (2d Cir. 2016) (rejecting, on plain error review, defendants' argument that restitution award to downstream lenders was erroneously based on unpaid principal loan balance rather than amount actually paid for loan where, "[n]othing in the record permits us to assess the likelihood that all or any of the loans would have been sold at a discount, at face value, or at a premium").

The government contends, however, that these cases, "all of which involve lenders who purchased loans on the secondary market, rather than the lending bank itself, are wholly inapposite." Appellee's Br. at 27. At oral argument, the government stressed that Bank of America "*became* Countrywide," and now stands in a different position from a

successor lender who purchases distressed loans one at a time on the secondary market. The majority adopts this view as well. For purposes of calculating restitution under the MVRA, however, I believe this distinction makes no difference.

On this point, I am persuaded by the Ninth Circuit's reasoning in *United States v. Luis*, 765 F.3d 1061 (9th Cir. 2014). As the majority recounts, the defendant in *Luis* pleaded guilty to two counts of conspiring to engage in prohibited monetary transactions, arising out of his purchase of real property with fraudulently obtained loans. *Id.* at 1063. As relevant here, the defendant applied for and obtained two mortgages from Washington Mutual Bank for a property in Rancho Santa Fe, California in the amounts of $1,640,000 and $204,750. *Id.* at 1064. Subsequently, in 2008, JP Morgan Chase Bank purchased Washington Mutual Bank's assets and liabilities and paid about $90 billion for a group of loans—including the Rancho Santa Fe mortgages—totaling about $120 billion of unpaid debt. *Id.* at 1064–65. The Rancho Santa Fe loans went into default in 2009, and Chase sold the property at a foreclosure sale in 2011. *Id.* The Ninth Circuit described the basis for the defendant's assignment of error on appeal as follows:

> The district court ordered $615,935 in restitution to Chase. The court subtracted the Rancho Santa Fe property foreclosure sale price ($1,228,815) from the unpaid principal balance on the first mortgage ($1,640,000), resulting in a loss of $411,185 on the first mortgage. The court added this loss to the unpaid principal balance on the second mortgage ($204,750).

*Id.* at 1065.

The Ninth Circuit held that the district court erred by calculating restitution to Chase "by subtracting the foreclosure sale price of the property from the unpaid principal

33

balance on the loan." *Id.* at 1067. Reasoning that "Chase purchased the loans; it did not originate them," the Ninth Circuit vacated the restitution order and remanded for the district court to recalculate Chase's loss, based on "how much Chase paid for the fraudulent loans (or the value of the loans when Chase acquired them)." *Id.* (alterations omitted).

In this case, the government offered no evidence as to how Bank of America acquired Richie's mortgage loan, although the parties have represented that the loan was included among the assets of Countrywide that the Bank purchased.* Likewise, in *Luis*, the Rancho Santa Fe mortgages were included among the assets of Washington Mutual Bank purchased by Chase. *Id.* at 1064–65. The *Luis* court saw no reason to distinguish between Chase and any other downstream or successor lender in calculating the proper amount of restitution under the MVRA; nor do I. In other words, Bank of America "purchased [Ritchie's] loan; it didn't originate [it]." *Id.* at 1067. Therefore, I would hold that Bank of America's restitution award under the MVRA should turn on how much *it* paid to acquire the mortgage. Any other result would constitute an impermissible windfall to the successor lender.

Here, the district court ordered restitution to Bank of America in the amount of $1,385,444.83 using the same "arithmetic calculation"—subtracting the foreclosure sale

---

* Indeed, Bank of America's acquisition of Countrywide appears to be more complex than the parties have represented. *See, e.g.*, *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1221–22 (C.D. Cal. 2012) (detailing Bank of America's acquisition of Countrywide via reverse triangular merger).

amount from the outstanding principal balance on the loan—that it used to calculate loss under U.S.S.G. § 2B1.1. J.A. 177–78. While "[t]his is an appropriate approach for making an estimate of loss under the Guidelines, where the district court need not consider a victim's actual loss but may use evidence of the defendant's intended loss, or even the gain realized by the defendant," *Yeung*, 672 F.3d at 604 (citing U.S.S.G. § 2B1.1 cmt. n.3(A)–(B)), it will not do for purposes of determining the amount of restitution due a successor lender under the MVRA. *See Howard*, 784 F.3d at 752 ("[A]lthough the impact of sales of mortgage notes to downstream lenders is generally irrelevant to the total-loss calculation under USSG § 2B1.1, it is highly relevant in calculating restitution under the MVRA.").

It may be that the government would face a thorny evidentiary problem in proving the amount that Bank of America paid for Ritchie's loan. Nor does it escape me that "the determination of the restitution amount is by nature an inexact science." *Martin*, 803 F.3d at 596 (quoting *United States v. Huff*, 609 F.3d 1240, 1248 (11th Cir. 2010)). But under the MVRA, "[t]he government bears the burden of demonstrating by a preponderance of the evidence the amount of actual loss sustained by the victim." *United States v. Squirrel*, 588 F.3d 207, 213 (4th Cir. 2009) (citing 18 U.S.C. § 3664(e)). I would not ease that burden simply because it may prove difficult in this instance.

In light of the above, I would vacate the district court's judgment and remand for the district court to consider anew the amount of restitution. Accordingly, I respectfully dissent.