# United States Court of Appeals
### For the Eighth Circuit

_____

No. 12-3368
_____

United States of America

*Plaintiff - Appellee*

v.

Jeffrey John Wirth

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: March 15, 2013
Filed: June 27, 2013

_____

Before WOLLMAN and COLLOTON, Circuit Judges, and HOLMES,[1] District Judge.

_____

WOLLMAN, Circuit Judge.

[1]The Honorable P.K. Holmes, III, Chief Judge, United States District Court for the Western District of Arkansas, sitting by designation.

Jeffrey John Wirth appeals from the district court's[2] restitution order of $6,457,500, representing the amount of taxes Wirth owed but failed to pay from 2003 to 2005. He argues that the district court erred by relying on the testimony of an Internal Revenue Service (IRS) agent when calculating the amount of actual loss because the agent's calculations were not sufficiently supported by evidence and were otherwise erroneous. He also challenges the sufficiency of the evidence and argues that the district court erred by considering conduct outside the scope of the plea agreement, by failing to establish a restitution payment schedule, and by awarding restitution despite the complexity of the calculation thereof. We affirm.

## I. Background

In 1988, Wirth, a certified public accountant (CPA) and honors accounting graduate, became the sole shareholder, owner, president, and CEO of The Wirth Companies (TWC), a Subchapter S corporation that managed approximately thirty other corporations and partnerships, all of which were owned, almost exclusively, by Wirth. Through these entities, Wirth developed and managed commercial real estate. Wirth's then-wife, Holly, served as TWC's CFO from 1988 until her separation from Wirth in 2006. From 1995 until 2009, Paul Fox served as TWC's controller, director of operations, and ultimately vice president of real estate services. Since the early 1990s, Wirth and Holly had their and TWC's tax returns prepared by Michael Murry, a CPA.

In 2007, the IRS commenced a civil audit of one of Wirth's companies. Thereafter, the audit expanded to TWC and to Wirth and Holly individually. In late 2007 or early 2008, the matter was referred to the IRS criminal division, thereby suspending the civil audit.

---

[2]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

On August 17, 2011, a grand jury returned an indictment against Wirth, Holly, and Murry, charging, among other things, that they had conspired from or before January 2003 through at least February 2010 to defraud the United States by unlawfully evading the tax obligations of TWC, Wirth, and Holly, in violation of 18 U.S.C. § 371. On May 11, 2012, Wirth entered into a written plea agreement with the government, under which he pleaded guilty to the conspiracy-to-defraud charge in return for the dismissal of all other charges.

Wirth agreed to the following facts in the plea agreement. From at least 2003 and continuing until at least October 2006, he conspired with Holly and Murry to evade his, TWC's, and Holly's tax obligations. Specifically, he and Holly spent TWC's and several other Wirth-owned businesses' money for personal expenditures, including non-business travel and meals. He and Holly caused such spending to be recorded falsely on TWC's books and tax returns as business expenses. This false recording caused TWC's taxable business income to be understated falsely and reduced passthrough income flowing to his individual income tax returns. Wirth and Holly also failed to report on their federal tax returns as distributions more than $2 million in company money spent in 2003 to fund the purchase of an island in St. Alban's Bay, Lake Minnetonka, on which they planned to build a home for themselves, as well as at least $3 million in company money spent from 2003 to 2006 to fund the home's design and construction. From 2002 through 2005, Wirth grossly understated his reported wages at TWC—claiming only $12,000 per year—which resulted in his and TWC's underpayment of employment taxes. From 2003 through 2006, he caused to go unreported on TWC's tax returns substantial amounts of fee income earned by TWC during the construction and development of two properties, which caused the amount of adjusted gross income, taxable income, and total tax shown on his and Holly's income tax returns to be understated. Wirth, Holly, and Murry also caused year-end adjustments to TWC's and the related businesses' tax returns by recording management fees to reduce overall taxable income to nearly zero.

These entries had no business purpose, reduced income from profitable companies, and increased income to nonprofitable companies.

The parties reached no agreement on the amount of restitution. At the government's request, the district court held a restitution hearing on September 14, 2012. At the hearing, IRS Agent Nona Bosshart and defense expert Rodney Oakes, a former IRS agent of some thirty-three years' experience, testified.

On September 19, 2012, the district court sentenced Wirth to 54 months' imprisonment and ordered $6,457,500 in restitution, consisting of $2,132,760 for the year ending December, 31, 2003; $1,474,011 for the year ending December 31, 2004; and $2,850,729 for the year ending December 31, 2005. The district court based its restitution order on the following findings, among others: that the restitution calculation was not so complex as to preclude the entry of such an award; that Bosshart's testimony "was thorough, exhaustive and credible"; that Wirth had improperly deducted a wide array of expenses and understated his wages; that Wirth benefitted from Bosshart's application of a 39-year straight-line depreciation method; that Wirth failed to offer credible evidence that he was entitled to the benefit of net operating losses (NOLs) from 2002 and 2007; that the government, in all likelihood, had understated Wirth's tax obligations; and that any confusion regarding the restitution calculation was a product of Wirth's poor bookkeeping. By way of a restitution payment schedule, the district court ordered that "[o]ver the period of incarceration the defendant shall make payments of either quarterly installments of a minimum of $25 if working non-UNICOR or a minimum of 50% of monthly earnings if working UNICOR. It is recommended that the defendant participate in the Inmate Financial Responsibility Program while incarcerated."

## II. Discussion

"We review the district court's decision to order restitution for abuse of discretion and its underlying fact determinations for clear error." United States v.

Gregoire, 638 F.3d 962, 973 (8th Cir. 2011).  "To the extent the district court interpreted the Mandatory Victims Restitution Act (MVRA) to determine its obligations in awarding restitution, we review those interpretations de novo."  United States v. Frazier, 651 F.3d 899, 903 (8th Cir. 2011).  "While the amount of loss calculation looks to the greater of actual or intended loss, the amount of restitution under the MVRA cannot exceed the actual, provable loss realized by the victims."  United States v. Alexander, 679 F.3d 721, 731 (8th Cir. 2012) (internal quotation marks and citation omitted).  "The government bears the burden of proving the amount of restitution based on a preponderance of the evidence."  Frazier, 651 F.3d at 903.

## A.  Bosshart's Restitution Calculation

Wirth argues that the district court erred in adopting Bosshart's restitution calculation.  Specifically, he argues that Bosshart erred in her calculations and improperly based her calculations on unsupported and inaccurate assumptions.

Wirth first argues that Bosshart failed to afford him the benefit of NOLs from 2002 and 2007.  He argues that he was given the benefit of a NOL from 2006 and that Oakes testified that if he were afforded the benefit of NOLs from 2002 and 2007 there would be no actual loss to the government and thus no restitution.  The district court concluded that Wirth was not entitled to the benefit of the claimed 2002 or 2007 NOLs because they were "not credibly based on reliable tax return information[.]"  Bosshart testified that, in making her adjustments and calculations, she did not afford Wirth the benefit of the claimed 2002 or 2007 NOLs because she did not find them credible, because the 2002 records were closed, and because Wirth could seek the benefit of the NOLs at later collection proceedings.  Considering Bosshart's testimony, the scope of Wirth's tax fraud, the disarray of his accounting records, and that the NOLs were included in tax returns prepared by Murry, we cannot say that the

district court clearly erred in finding that Wirth was not entitled to the benefit of the claimed 2002 and 2007 NOLs at this time.

Wirth next argues that Bosshart erroneously assumed that he had zero basis in his businesses. Bosshart testified that Wirth, as a shareholder, was responsible for tracking his basis; that he failed to do so; and that treating him as having zero basis was thus proper. Bosshart's zero-basis assumption was also supported by her testimony regarding a "letter that discussed there was no basis" and that Fox told her that he "repeatedly heard Mike Murry tell [Wirth] that he had no basis[,]" which was itself supported by Murry's admission in his own sentencing memorandum. Based on the foregoing, the district court did not clearly err in finding that Wirth had zero basis in his businesses.

Wirth also contends that Bosshart improperly applied a 39-year straight-line depreciation method to certain hard assets having a far shorter life than 39 years. He relies on Oakes's testimony that an accelerated depreciation rate and shorter life would have been more appropriate for these items. Bosshart testified and produced exhibits demonstrating that she had made adjustments by applying the 39-year straight-line depreciation method to certain previously unrecognized capitalized costs, which arose from previously unreported development fees, and that doing so was to Wirth's benefit. In these circumstances, the district court did not clearly err in relying on Bosshart's testimony and exhibits over Oakes's contrary testimony.

Finally, Wirth argues that Bosshart erroneously assumed that he had used TWC loan proceeds to pay for personal expenses when calculating capital gains distribution in excess of basis. He argues that the loans instead went directly to TWC to be used to manage its properties, which themselves did not have checking accounts. Wirth acknowledged in the plea agreement that he had failed to report millions of dollars worth of distributions—not loans—of TWC money that he used for his personal benefit. Moreover, Bosshart testified regarding Wirth's use of loan proceeds, and the

government introduced exhibits supporting her testimony and explaining her calculations. Wirth has not shown that the district court clearly erred in adopting this aspect of Bosshart's calculations.

## B. Sufficiency of the Evidence

Wirth challenges the sufficiency of the evidence, arguing that the exhibits were vague and that Bosshart's testimony was insufficient. He argues that the government failed to explain its analysis in detail and that the district court should have more thoroughly explained its findings.

As recounted above, to establish actual loss the government offered Bosshart's lengthy testimony, as well as a wealth of exhibits summarizing and otherwise explaining Bosshart's adjustments and calculations.[3] See United States v. Ellefsen, 655 F.3d 769, 782 (8th Cir. 2011) (amount of restitution proven by summary document, supporting explanatory documents, IRS agent testimony, Revenue Agent Reports, and certified IRS transcripts). We conclude that the district court did not abuse its discretion in finding that the government met its burden of proving actual loss by a preponderance of the evidence. See United States v. Lewis, 557 F.3d 601, 615 (8th Cir. 2009) (no clear error in restitution calculation involving "approximations and rounding"); United States v. Farrington, 499 F.3d 854, 861 (8th Cir. 2007) ("Farrington's mere assertion of potential double-counting, without any factual support, does not establish an abuse of discretion in determining the restitution

---

[3]Wirth also contends that he was denied a meaningful opportunity to challenge the government's restitution calculation before and during the restitution hearing. We find this argument unpersuasive. In response to a prehearing request by Oakes for additional calculations, the government responded that it "ha[d] already disclosed all calculations and backup schedules relative to its restitution calculation." Wirth was also afforded an opportunity to challenge Bosshart's calculations at the restitution hearing—an opportunity that his counsel utilized through thorough cross-examination and the introduction of conflicting testimony.

amount."). In light of TWC's abysmal bookkeeping records (described as "terrible" by defense witness Oakes), Wirth is hardly in a position to insist that the district court's restitution award be calculated with Pythagorean precision. See United States v. Pierce, 479 F.3d 546, 554 (8th Cir. 2007) ("In this case, the difficulty in calculating a precise amount of loss is attributable to the lack of sufficient financial records [maintained by the defendants].''). For these reasons also, we conclude that the district court's oral and written findings were sufficiently thorough to support its restitution order.

## C. Conduct Outside the Plea Agreement

Wirth next challenges the inclusion of certain boating-related expenses in the restitution award, arguing that because he did not stipulate to the unlawful deduction of these expenses in the plea agreement, the district court should not have ordered restitution arising therefrom. In the plea agreement, Wirth stipulated that he "spen[t] substantial amounts of TWC and several other Wirth-owned businesses' . . . money for personal expenditures[.]" The boating-related expenses were thus within the scope of his stipulation. Moreover, because "victim restitution may be ordered for criminal conduct that is part of a broad scheme to defraud, without regard to whether the defendant is convicted for each fraudulent act in the scheme[,]" Farrington, 499 F.3d at 861 (quoting United States v. Ross, 279 F.3d 600, 609 (8th Cir. 2002)), greater particularity was not required.

Wirth also challenges the district court's finding that the boating-related expenses were unlawfully deducted as business expenses. Bosshart testified that witnesses had stated that "there was very little, if any, business use going on on that boat." In disputing the accuracy of this testimony, Wirth offers exhibits which, he asserts, establish that the boating-related expenses were indeed properly deducted

-8-

business expenses.[4] Even considering the exhibits, we conclude that the district court did not clearly err by relying on Bosshart's testimony that the boating-related expenses were personal expenses that were unlawfully deducted as business expenses.

## D. Payment Schedule

Wirth argues that the district court failed to establish a restitution payment schedule. The MVRA requires that the district court, "[u]pon determination of the amount of restitution owed to each victim, . . . specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid[.]" 18 U.S.C. § 3664(f)(2). "In this case, where restitution is mandatory, the district court nevertheless has substantial discretion in determining how that mandatory restitution is to be paid[.]" United States v. Vanhorn, 344 F.3d 729, 731 (8th Cir. 2003) (internal citations omitted).

As stated above, the district court did establish a restitution payment schedule. Wirth argues that the payment schedule has no practical effect because the amount he must pay, if any, is only nominal. The MVRA, however, authorizes a district court to order such payments. See 18 U.S.C. § 3664(f)(3)(B). The scheduling of such payments was reasonable given the state of Wirth's personal finances and the pendency of bankruptcy proceedings (both of which were detailed in the presentence report's factual findings adopted by the district court), as well as the likelihood of future, related collection proceedings. See 26 U.S.C. § 6201(a)(4)(A) ("The Secretary shall assess and collect the amount of restitution under an order pursuant to section 3556 of Title 18, United States Code, for failure to pay any tax imposed under this title in the same manner as if such amount were such tax."); United States v. Tucker, 217 F.3d 960, 962 (8th Cir. 2000) ("Of course, any amounts paid to the IRS as

[4]The government moves to strike these and other exhibits on the basis that they were not first offered to the district court. Because we find Wirth's reliance on the disputed exhibits unavailing, we deny the motion as moot.

-9-

restitution must be deducted from any civil judgment IRS obtains to collect the same tax deficiency."). Accordingly, Wirth's arguments fail.

## E. Complexity Exception

Lastly, Wirth argues that the district court erred by not invoking the MVRA's complexity exception, 18 U.S.C. § 3663A(c)(3)(B). Under § 3663A(c)(3)(B), the district court may decline to award restitution if "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."

In rejecting Wirth's complexity argument, the district court explained that Wirth's case was a "straightforward fraud case with a single identified victim" and that "[t]he tracking of the payments and receipts by the Government was a fairly simple draw method to estimate tax loss[.]" Only two witnesses were called at the restitution hearing, which lasted only one day, and the number of exhibits concerning restitution was not overwhelming. In these circumstances, the district court did not abuse its discretion by not applying the complexity exception set forth in § 3663A(c)(3)(B).

## III. Conclusion

The district court's restitution order is affirmed. The government's motion to strike portions of Wirth's appendix and brief is denied as moot.

_____

-10-