In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 21-2572 & 21-3157

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHAMAR BETTS,

*Defendant-Appellant.*

_____

Appeals from the United States District Court for the
Central District of Illinois.
No. 20-cr-20047 — **Michael M. Mihm**, *Judge.*

_____

ARGUED APRIL 8, 2022 — DECIDED APRIL 29, 2024

_____

Before WOOD, HAMILTON, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* During a weekend of national unrest after a police officer murdered George Floyd, Shamar Betts posted a flyer on Facebook calling on people to bring posters, bricks, and bookbags to a "RIOT" at a mall in Champaign, Illinois. The next day, a riot ensued and several businesses were damaged. Betts was indicted for inciting a riot in violation of the Anti-Riot Act, 18 U.S.C. § 2101. He

moved to dismiss the indictment arguing that the Anti-Riot Act was overbroad in violation of the First Amendment, but the district court denied his motion. He then pled guilty. At sentencing, the district court sentenced Betts to 48 months' imprisonment and ordered him to pay $1,686,170.30 to 35 businesses under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A.

Betts raises several issues on appeal. First, Betts asks us to reconsider our court's decision in *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), upholding the Anti-Riot Act as constitutional under the First Amendment. Absent a compelling reason to do so however, we decline to overrule the case. Betts's challenge to the Anti-Riot Act for overbreadth is therefore foreclosed.

Second, Betts argues that the district court erred in choosing what sentencing guideline to apply by way of analogy to his conviction under the Anti-Riot Act, which does not have its own guideline. We join our sister circuits in holding that the decision to apply a sufficiently analogous guideline requires an elements-based, flexible approach, and we see no error in the district court's application of the property offense guideline to the Anti-Riot Act.

Finally, Betts raises several challenges to the district court's order of restitution, including whether the Anti-Riot Act is a covered offense under the MVRA, which is an issue of first impression. We conclude, as our sister circuits have, that the plain language of the MVRA supports that courts may look to the underlying facts of an offense to determine whether a crime is an "offense against property" as required by statute. Based on this, Betts's conviction under the Anti-Riot Act qualifies. But we agree with Betts's other argument

concerning restitution—that the government failed to meet its burden showing that he directly and proximately caused damages to all businesses included in the restitution order. We therefore vacate the sentence with regard to the amount of restitution ordered and remand for the limited purpose of reconsidering the amount of restitution consistent with this opinion.

**I**

On May 30, 2020, Shamar Betts posted a flyer on Facebook that read: "RIOT @ MarketPlace Mall Time: 3 … Bring friends& [sic] family, posters, bricks, bookbags etc. After the mall we hitting the whole PROSPECT & NEIL." The flyer, which was posted during a weekend of George Floyd protests, included an image of a burning car flanked by people. Along with the flyer, Betts wrote: "I'm just the messenger. We're literally sitting on our ass watching the whole country and even others fight for our black rights … We gotta put Champaign/Urbana on the map mfs gone hear and fear us too."

The next day, Betts and a group of 50 to 75 people gathered at Market Place Mall. At approximately 3:12 p.m., they began damaging property and looting stores. Betts captured the riot on Facebook Live telling his viewers "[l]ook what a n**** just started … look what a n**** just started. We out here …." In another video, Betts is seen looting two stores: Macy's and Old Navy. The riot moved to other businesses on Prospect Avenue and Neil Street. Betts participated in the riot for an hour or so, but rioting apparently lasted until the early morning hours. By the next day, several businesses were damaged and lost merchandise. As revealed in text messages to friends and family, Betts proudly took credit for starting the riot.

Betts was later arrested and indicted for inciting a riot, in violation of 18 U.S.C. § 2101, the Anti-Riot Act. He filed a motion to dismiss the indictment arguing, in part, that the Anti-Riot Act was unconstitutionally overbroad in contravention of the First Amendment. Because our court rejected a similar argument in *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), the district court denied his motion. Betts pled guilty.

At sentencing, Betts asked the court to sentence him, as the court must, according to the sentencing factors outlined in 18 U.S.C. § 3553(a), but without regard to any advisory sentencing guidelines (one of the § 3553(a) sentencing factors) because there is no guideline associated with the Anti-Riot Act. The maximum prison sentence Betts could have received under the Anti-Riot Act is 60 months. Betts requested a sentence of time served, which at that point amounted to 12 months.

Also at sentencing, Betts objected to any award of restitution under 18 U.S.C. § 3663A, the Mandatory Victims Restitution Act. He argued that the MVRA was inapplicable to the Anti-Riot Act because, under the categorical approach, the Anti-Riot Act did not count as an "offense against property" or any other offense category falling within the statute. Even if the MVRA was applicable, he argued, the government failed to show that his rioting directly and proximately harmed the businesses the government identified—a task which, Betts also argued, would be complicated, and thus fell within the MVRA's complexity exception.

Over Betts's objection, the district court chose to apply a sentencing guideline that it deemed analogous to the Anti-Riot Act: Section 2B1.1, which covers property damage and theft. With this guideline, Betts's advisory guidelines range was 70–80 months although, again, the statute imposed a

maximum of 60 months. The district court then sentenced Betts to 48 months' imprisonment, reduced to 36 months to include credit for time served in state custody.

The district court also determined that a violation of the Anti-Riot Act qualified as an "offense against property" under the MVRA. In calculating restitution, the district court concluded that the government met its burden as to causation, rejecting Betts's position that the government had to prove, at minimum, who caused the damage and whether those individuals did so because of Betts's Facebook post. The government presented a spreadsheet listing 73 businesses that were affected during the riot, along with amounts for property damage and stolen merchandise. The total was $2,172,074.90. However, only forty-three of those businesses could or were willing to substantiate their losses.

The district court declined to apply the MVRA's complexity exception but acknowledged that there was an issue as to scope, and that Betts could not be held responsible for all the businesses listed on the government's spreadsheet. The district court noted that "[t]here is a valid question [] about whether the people who showed up at the mall are the same people that [Betts] reached out to or learned about his communications." The district court then decided that, based on Betts's flyer, of the forty-three claimants who could or would substantiate their losses, the district court would order restitution only to those businesses "located at the mall or on Prospect or Neil." The district court ordered the parties to meet and confer about which of the forty-three businesses fell within the geographic scope of the district court's restitution order.

The parties later submitted a joint restitution agreement identifying twenty-six businesses that fell within the geographic scope, for a total of $1,374,729.57. But they disagreed on the remaining twelve businesses, totaling $357,433.43 in restitution. Betts argued that the remaining twelve businesses were not "on Neil Street or Prospect Avenue," whereas the government argued that the district court's order included all businesses located in "the commercial district at Prospect Avenue and Neil Street." After a hearing on the matter, the district court mostly agreed with the government and, using Interstate 74 as a boundary line, ruled that nine of the twelve disputed businesses were to be included in restitution. After this ruling, Betts sought to withdraw the parties' earlier joint agreement on the basis that the businesses that he initially agreed to no longer fell within the geographic scope of the court's order, but the court denied his request. The district court ordered Betts to pay $1,686,170.30 in restitution to 35 businesses. Betts appealed.

## II

Betts presents several arguments on appeal. First, he argues that the district court's order denying his motion to dismiss must be reversed because the Anti-Riot Act is unconstitutionally overbroad in violation of the First Amendment. Second, he argues, in the alternative, that the case should be remanded with instructions for the district court to resentence him without an analogous offense guideline. Third, he raises several challenges to the district court's order of restitution under the MVRA, including the MVRA's application to his

conviction in the first place. We review each of Betts's arguments in turn.

## A. The Constitutionality of the Anti-Riot Act

### 1. Overbreadth Doctrine

We review a constitutional challenge to a statute de novo. *United States v. Fredrickson*, 996 F.3d 821, 823 (7th Cir. 2021). Under the First Amendment overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). But "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). For a facial overbreadth challenge to be successful, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court. *Id.; see also New York v. Ferber*, 458 U.S. 747, 769 (1982) (a claimant may attack an overly broad statute even though the conduct of the person making the attack is unprotected). If, however, a law captures only a narrow band of speech unprotected by the First Amendment, an overbreadth challenge is unlikely to succeed. *United States v. Hansen*, 143 S. Ct. 1932, 1940 (2023).

Application of the overbreadth doctrine is "strong medicine" and, therefore, it should be employed sparingly and only as a last resort. *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). We will not rely on the overbreadth doctrine if we can instead construe the challenged statute in a way that avoids any constitutional problems. *Id.* at 616; *Ferber*, 458 U.S. at 769. If the statute is not subject to a narrowing construction and is

impermissibly overbroad, we then assess whether the unconstitutional portion is severable. *Ferber*, 468 U.S. 769 at n.24. Severance is a remedy that must be applied whenever possible. *United States v. Booker*, 543 U.S. 220, 258–59 (2005); *see also Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328–29 (2006) ("[g]enerally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem," severing any "problematic portions while leaving the remainder intact"). A claimant bears the burden of demonstrating that substantial overbreadth exists. *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (citation omitted).

### i.    The Anti-Riot Act

The Anti-Riot Act provides:

> (a) Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent--
>
> > (1) to incite a riot; or
> >
> > (2) to organize, promote, encourage, participate in, or carry on a riot; or
> >
> > (3) to commit any act of violence in furtherance of a riot; or
> >
> > (4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot;
>
> and who either during the course of any such travel or use or thereafter performs or attempts

to perform any other overt act for any purpose specified in subparagraph (A), (B), (C), or (D)[1] of this paragraph --- [s]hall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 2101(a). The Act defines "riot" in part as a public disturbance involving:

(1) an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual ….

18 U.S.C. § 2102(a). The Act further provides:

(b) As used in this chapter, the term "to incite a riot", or "to organize, promote, encourage, participate in, or carry on a riot", includes, but is not limited to, urging or instigating other persons to riot, but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts.

---

[1] The statute's references to nonexistent subparagraphs (A), (B), (C), or (D), is a scrivener's error. It should instead be read as referring to paragraphs (1) through (4) of subsection (a). *See, e.g., United States Nat'l. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 462 (1993) (court may correct a scrivener's error).

18 U.S.C. § 2102(b).

Betts raises a host of challenges to the constitutionality of the Anti-Riot Act. He argues that the "overt act" requirement fails to pass the imminence test set forth by *Brandenburg v. Ohio*, 395 U.S. 444 (1969), which held that the First Amendment prohibits speech that is: (1) directed at inciting or producing *imminent* lawless action; and (2) likely to incite or produce such action. *Id.* at 447. Betts contends that the Anti-Riot Act criminalizes acts taken long before a crowd gathers or acts that have only an attenuated connection to any riot, so long as the individual acts with the required purpose laid out in 18 U.S.C. § 2101(a)(1)–(4). Betts also argues that the Act's use of the terms "organize, promote, encourage" and "urging" are overbroad, and that the double negative raised in § 2102(b) ("… but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, not involving advocacy") punishes mere advocacy which is protected speech. *See Brandenburg*, 395 U.S. at 444.

Notably, Betts raises arguments that we considered and rejected in *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972). In *Dellinger*, we construed the Anti-Riot Act narrowly, and concluded that the acts referred to in subsections § 2101(a)(1)–(4) were necessary overt acts and not merely goals to which the overt acts contribute. *Id.* at 361–362. We noted that this construction was supported by § 2101(b)[2]

---

[2] Section 2101(b) reads: "In any prosecution under this section, proof that a defendant engaged or attempted to engage in one or more of the overt acts described in subparagraph (1), (2), (3), or (4) of paragraph (1) of subsection (a) and (1) has traveled in interstate or foreign commerce, or (2) has use of or used any facility of interstate or foreign commerce, including

which refers to "one or more of the overt acts described in subparagraph (A), (B), (C), or (D) of paragraph (1) of subsection (a) …." *Id.* at 362. Based on this narrow reading of the statute, we saw no violation of *Brandenburg*'s imminence requirement as far as this portion of the statute was concerned. *Id.*; s*ee also United States v. Rundo*, 990 F.3d 709, 716 (9th Cir. 2021) (adopting *Dellinger's* conclusion that the overt act requirement refers to acts that fulfill the elements themselves, and not mere steps towards, or related to, one or more of those elements).

We also concluded that the verbs "organize, promote, encourage" and "urging" required a close relationship to imminent action. *Dellinger*, 472 F.2d at 361–62. And while we acknowledged that the double negative in the statute created a serious problem, we explained that the drafters could have included this language to forestall a First Amendment defense in the case of a truly inciting, action-propelling speech. *Id.* at 363. Based on our narrow construction, we rejected an overbreadth challenge to the Anti-Riot Act.

Betts asks us to revisit *Dellinger* and the Anti-Riot Act in light of two out-of-circuit cases determining that the Anti-Riot Act is unconstitutionally overbroad: *United States v. Miselis*, 972 F.3d 518, 537 (4th Cir. 2020), and *United States v. Rundo*, 990 F.3d 709, 716 (9th Cir. 2021). In *Miselis*, the Fourth Circuit held that the words "encourage," "promote," and "urge" were overbroad, and failed to bear the requisite relationship

---

but not limited to, mail, telegraph, telephone, radio, or television, to communicate with or broadcast to any person or group of persons prior to such overt acts, such travel or use shall be admissible proof to establish that such defendant traveled in or used such facility of interstate or foreign commerce." 18 U.S.C. § 2101(b).

between speech and lawlessness. 972 F.3d at 537–38. In *Rundo*, the Ninth Circuit agreed with the Fourth Circuit's analysis and held that the word "organize" also punishes protected speech. 990 F.3d at 717. Additionally, both courts held that the use of the double negative in § 2102(b) punished advocacy and was therefore overbroad. *See Miselis*, 972 F.3d at 539; *Rundo*, 990 F.3d at 718. Betts wants us to follow the Fourth and Ninth Circuits' approach, at least the reasoning up until this point.

But we will not overturn circuit precedent "absent a compelling reason." *Wilson v. Cook County*, 937 F.3d 1028, 1035 (7th Cir. 2019). "[P]rinciples of stare decisis require that we give considerable weight to prior decisions unless and until they have been overruled or undermined by the decisions of a higher court, or other supervening developments, such as a statutory overruling." *Id.* (citations omitted). Neither the Supreme Court nor Congress has overruled *Dellinger* or found the Anti-Riot Act unconstitutional for overbreadth.

Nor do the decisions in the Fourth and Ninth Circuits provide a compelling reason to overrule *Dellinger*. Even if we were inclined to revisit *Dellinger*, both sister circuits that Betts wishes us to follow concluded that the overbroad portions of the Anti-Riot Act could be severed. *See Miselis*, 972 F.3d at 537; *Rundo*, 990 F.3d at 720; *see also Ayotte*, 546 U.S. at 329 (sever "problematic portions while leaving the remainder intact"). In severing the overbroad portions, both courts left the remainder of the statute intact, which includes the parts of the statute relevant to Betts's conduct. The indictment in this case, after all, alleged that Betts violated all the subparts of § 2101(a). Betts pled guilty and admitted that he used facilities of interstate commerce to incite a riot, and that he carried on

and participated in the riot. Thus, either way—whether by narrow construction or by severance—Betts is still subjected to the Anti-Riot Act.

We acknowledge, as we did in *Dellinger* nearly 50 years ago, that the Anti-Riot Act presents some First Amendment problems. *See* 472 F.2d at 362 ("We do not pretend to minimize the first amendment problems presented on the face of this statute."). And had it come before this court today, *Dellinger* may have been decided differently, and potentially more in line with the Fourth and Ninth Circuits. We may one day revisit *Dellinger*, but today is not the day because Betts's conduct falls within the Anti-Riot Act no matter what mechanism we use to remedy constitutional problems with the statute. *Dellinger* remains good law, and Betts has not supplied a compelling reason for us to overrule the decision. *Dellinger* therefore forecloses Betts's overbreadth argument.

## B. Analogous Guideline for the Anti-Riot Act

We now turn to Betts's sentencing arguments. We begin with his challenge to the district court's application of an analogous guideline to the Anti-Riot Act, which is a matter of first impression for our court.

There is no sentencing guideline for the Anti-Riot Act. Section 2X5.1 provides that if a felony offense has no guideline, then a court applies the guideline for the most analogous offense. If there is no sufficiently analogous guideline, courts turn to 18 U.S.C. § 3553(b). *Id.* The commentary to § 2X5.1 states:

> Many offenses … are not listed in the Statutory Index or in any of the lists of Statutory Provisions that follow each offense guideline.

> Nonetheless, the specific guidelines that have
> been promulgated cover the type of criminal be-
> havior that most such offenses proscribe. The
> court is required to determine if there is a suffi-
> ciently analogous offense guideline, and, if so,
> to apply the guideline that is most analogous.

U.S.S.G. § 2X5.1 comment.

To comply with § 2X5.1, a district court must first deter-
mine whether *any* guideline is sufficiently analogous to the
defendant's crime of conviction. *See United States v. Clark*, 981
F.3d 1154, 1162 (10th Cir. 2020). To determine whether there
is a sufficiently analogous guideline provision, courts have
typically considered three approaches. *See United States v.
Jackson*, 862 F.3d 365, 372 (3d Cir. 2017) (identifying the three
approaches). The first approach is the elements-based ap-
proach. *See id.* Under an elements-based approach, a court
compares the elements of the defendant's crime of conviction
to the elements of federal offenses already covered by a spe-
cific guideline. *Clark*, 981 F.3d at 1162. The second approach is
the indictment-facts approach, where the district court com-
pares the guidelines to the facts alleged in the indictment. *See
United States v. McEnry*, 659 F.3d 893, 900 (9th Cir. 2011) (dis-
trict court erred when it based its choice "not on the elements
of the offense or the facts alleged in the indictment, but on the
defendant's particular relevant conduct and the risk it cre-
ated"); *but see Jackson*, 862 F.3d at 372–73 (indictment-facts
usually applies when more than one guideline is assigned to
a statute or when no guideline is assigned, but the court de-
termines more than one guideline is sufficiently analogous,
and selects the most analogous). And the third approach is
known as the broad-circumstances approach, where the

district court considers all of the circumstances and makes factual findings to support its ultimate selection. *See Jackson*, 862 F.3d at 372.

Betts and the government agree that the elements-based approach is the most appropriate for his case. The majority of circuits that have decided the issue have also adopted this approach. *See Clark*, 981 F.3d at 1162; *Jackson*, 862 F.3d at 374-5; *United States v. Calbat*, 266 F.3d 358, 363 (5th Cir. 2001); *United States v. Osborne*, 164 F.3d 434, 437–38 (8th Cir. 1999). We now join those circuits in holding that courts should apply the elements-based approach to decide whether a guideline is sufficiently analogous to the defendant's crime of conviction. This inquiry, however, should be "conducted in a flexible and open-ended fashion." *Jackson*, 862 F.3d at 375. "While the inquiry may still be 'bounded by the elements of the offense of conviction,' … a perfect match of elements is not necessary (or even expected)." *Id.* at 376. "Instead, the proffered guideline need only be within the same proverbial 'ballpark' as the offense of conviction." *Id.* Because the elements-based approach is a purely legal approach, and the district court need not consider the underlying facts, *see United States v. Nichols*, 169 F.3d 1255, 1270 (10th Cir. 1999), we will review a district court's determination as to whether there is a "sufficiently analogous" guideline to the defendant's crime de novo. *See Osborne*, 164 F.3d at 437–38.[3]

---

[3] We note that, in some cases, there is a second step: when there is more than one sufficiently analogous guideline, the district court must then choose the most analogous guideline. Appellate courts differ on whether the district court's decision at this step should be reviewed de novo or given due deference. *Osborne*, 164 F.3d at 437–38 (noting the circuit split).

The district court concluded that § 2B1.1 was an analogous guideline. Section 2B1.1 covers larceny, embezzlement, and other forms of theft; offenses involving stolen property; property damage or destruction; fraud and deceit, forgery; and offenses involving altered or counterfeit instruments other than counterfeit bearer obligations of the United States. *Id.* Betts takes issue with the district court's application of § 2B1.1 as an analogous guideline because, as he sees it, the Anti-Riot Act does not have "property damage" as an element. Betts is correct; the elements of an Anti-Riot Act offense are:

1.  Using a facility of interstate commerce to;

2.  Organize, promote, encourage, participate in or carry on a riot; and

3.  Performing or attempting to perform an overt act in furtherance of that riot.

18 U.S.C. § 2101(a). But the elements-based approach does not require the same exact elements. It need only be "sufficiently analogous" and not "a perfect match." *See, e.g.*, *United States v. Allard*, 164 F.3d 1146, 1147 (8th Cir. 1999) (concluding that the involuntary manslaughter guideline was sufficiently analogous to vehicular battery even though involuntary manslaughter requires death of the victim and vehicular battery does not); *see also United States v. Cothran*, 286 F.3d 173, 174 (3d Cir. 2002) (possessing dangerous weapon guideline sufficiently analogous—though not most analogous—to a crime of conveying false information and threats about carrying explosives on an airplane). In this context, the elements-based

---

This case does not involve more than one sufficiently analogous guideline, so we decline to decide the appropriate standard of review for this second step.

approach must be "conducted in a flexible and open-ended fashion." *Jackson*, 862 F.3d at 375. Here, the property damage guideline is sufficiently analogous to the Anti-Riot Act, which does not include as an exact element property damage, but does contemplate, or can involve, property damage. We therefore take no issue with the court's application of § 2B1.1 as an analogous guideline. As we see it, the guideline is in the same "proverbial 'ballpark'" as the Anti-Riot Act. *Id.* at 376.

### C. Restitution under the Anti-Riot Act

Finally, we address Betts's arguments regarding restitution. We begin with the question of whether the MVRA covers the Anti-Riot Act. Whether the MVRA covers the Anti-Riot Act is a matter of statutory interpretation that we review de novo. *See United States v. Miller*, 883 F.3d 998, 1003 (7th Cir. 2018).

####    1.  *Application of the MVRA*

Courts lack inherent authority to order restitution and may do so only when authorized or required by statute. *See United States v. Burns*, 843 F.3d 679, 689 (7th Cir. 2016). The MVRA requires a court to order restitution in "all sentencing proceedings for convictions of … any offense … that is … an offense against property under [Title 18] … including any offense committed by fraud or deceit … [and] in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(A)(ii), (B). The statute does not define "an offense against property," and the Supreme Court has yet to address the issue. But all circuits to have tackled the question have concluded that determining what constitutes an "offense against property" depends on the facts and circumstances of the case. *See, e.g., United States*

*v. Razzouk*, 984 F.3d 181, 188 (2d Cir. 2020) ("[W]e look to the manner in which [defendant] committed the crime and the facts and circumstances of the crime."); *United States v. Ritchie*, 858 F.3d 201, 208 (4th Cir. 2017); *United States v. Collins*, 854 F.3d 1324, 1334 (11th Cir. 2017); *United States v. Sawyer*, 825 F.3d 287, 292–93 (6th Cir. 2016); *United States v. Quarrell*, 310 F.3d 664, 678 (10th Cir. 2002).

Betts, however, argues for the categorical approach which, if it applies, does not bring the Anti-Riot Act within the MVRA's purview. Betts argues that the MVRA uses the word "offense" which indicates that it is to be defined by law and the elements. He also argues that the relationship between the MVRA and its discretionary counterpart, the Victim Witness Protection Act (VWPA), 18 U.S.C. § 3663, supports that the MVRA is drafted to apply to specific, narrow offenses. Finally, Betts argues that other subsections of the MVRA require a categorical approach, and so "offense against property" should be treated no differently.

We start by briefly addressing the relationship between the MVRA and the VWPA. Unlike the MVRA, restitution under the VWPA is discretionary and applies to a broader range of offenses, specifically those not covered by the MVRA. Because the VWPA is discretionary, a district court is allowed to consider a defendant's economic status in deciding whether to impose restitution. The MVRA supplemented the VWPA and made restitution mandatory for certain crimes enumerated in the statute: crimes of violence, offenses against property, and other specific offenses for specific federal statutes. But the MVRA's application to certain crimes does not translate into requiring a categorical approach for all offenses. Rather, we must start with the text of the actual statute to

ascertain its meaning, *see Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985) ("[T]he starting point in every case involving construction of a statute is the language itself." (citations omitted)), and in this case, determine whether the statute contains any of the markers that typically signal Congress's intent for the statute to be construed categorically. *See Nijhawan v. Holder*, 557 U.S. 29, 34–35 (2009) (apply categorical approach when the statute "read naturally … refer[s] to a generic crime as *generally* committed").

For this, Betts points to the statute's use of the word "offense" and, specifically, that the MVRA "shall apply in all sentencing proceedings for convictions of … any *offense* …" 18 U.S.C. § 3663A(c)(1) (emphasis added). Betts is correct that the word "offense" may refer to a generic crime, but this is not the only meaning. The word "offense" may also refer to "the specific acts in which an offender engaged on a specific occasion." *Nijhawan*, 557 U.S. at 33–34. It is therefore not enough that MVRA uses the word "offense"—there must be some other indication that the word "offense" refers to a generic crime.

The MVRA's other subsections illustrate this point. For example, the MVRA also applies to crimes of violence. A "crime of violence" is defined as "an offense that has as an *element* the use, attempted use, or threatened use of physical force against the person or property of another," 18 U.S.C. § 16(a) (emphasis added); 18 U.S.C. § 3663A(c)(1)(A)(i). The use of the word "elements" necessitates a categorical approach. *See Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004) ("This language requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to [the] crime."). But the MVRA's reference to an "offense against property" does not include the word "elements" or any other

indication suggesting a categorical approach. *See Razzouk*, 984 F.3d at 187–88 ("The contrast in these neighboring statutory sections, enacted in a single bill, thus highlights that Congress could have used such an 'elements' formulation when it described an 'offense against property'; that it did not suggests that we should treat the difference as intentional and significant."); *Collins*, 854 F.3d at 1333–35 (declining the categorical approach based on the absence of the word "elements" in the definition of offense against property). This difference between the two subsections indicates that Congress intended for an "offense against property" to cover a broader range of prior offenses than those reached by a "crime of violence." *See Ritchie*, 858 F.3d at 209.

The text of the MVRA further supports this broad interpretation. The MVRA specifically states that an "offense against property" includes "any offense *committed* by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii) (emphasis added). The use of the word "committed" suggests that the manner of commission is important when determining whether an offense is one against property. *See also Razzouk*, 984 F.3d at 187 (citing *Taylor v. United States*, 495 U.S. 575, 599–600 (1990) (the use of "committed" suggests a focus on the manner of commission)); *Collins*, 854 F.3d at 1334. Further, had Congress wanted "offenses against property" to refer to a categorical approach, it would have included language in the statute to indicate this. Congress knew how to do this when referring to other subsections, so the fact that it did not do so for "offenses against property" appears to be intentional and factors against a categorical based approach. *See Razzouk*, 984 F.3d at 188 ("Congress could reasonably have intended that courts look to whether the crime in fact caused damage to a victim's interests in personal or other property so that the loss or

damage could be estimated and payment of restitution ordered."); *Ritchie*, 858 F.3d at 210 ("Congress could not have intended to exclude from the broad, mandatory reach of the MVRA those unfortunate victims who suffer property loss as a result of an offense that doesn't contain as an element a reference to 'property.'"). We therefore join our sister circuits in concluding that, based on the plain language of the MVRA, courts may consider the facts and circumstances of the underlying conviction to determine whether an offense is one against property.

Other circuits that have applied the facts and circumstances-based approach have found that an offense against property may include a range of different offenses that involve property. An offense against property may include crimes where the defendant had an intent to destroy property. *See, e.g.*, *Quarrell*, 310 F.3d at 678 (conspiracy to violate Archaeological Resources Protection Act qualified because while not every conspiracy involved an offense against property, the defendants in the case knowingly and voluntarily damaged the land). It may also include offenses where the crime results in physical harm to property. *See, e.g.*, *Sawyer*, 825 F.3d at 292 (defendant's conviction for conspiracy to violate the Clean Air Act was an offense against property because it resulted in asbestos contamination to nearly 300 acres of land); *United States v. Brock-Davis*, 504 F.3d 991, 993, 996–98 (9th Cir. 2007) (ordering defendant convicted of conspiracy to manufacture meth to pay restitution to motel owner forced to remediate a motel room in which defendant cooked meth). And it may even include crimes involving no property damage at all. *See, e.g.*, *United States v. Luis*, 765 F.3d 1061, 1066 (9th Cir. 2014) (noting that "offense against property" means infringing on a victim's property interest).

Here, Betts incited a riot for the purpose of looting and damaging property. Indeed, the flyer he posted on Facebook told people to bring "bricks" and "bookbags," and pictured a burning car. In sum, Betts's incitement of property damage and looting qualifies as an offense against property.

2. *Victims, Causation, and Complexity Exception under the MVRA*

Betts next argues that the 35 businesses he was ordered to pay restitution to were not victims under the MVRA because the government failed to prove that he directly and proximately caused them damage. Betts also argues that the issue of causation involves complex issues of fact that would prolong sentencing, so the district court erred in not applying the MVRA's complexity exception. We review the district court's restitution decisions for abuse of discretion. *See United States v. Wyatt*, 9 F.4th 440, 452 (7th Cir. 2021).

The purpose of the MVRA is to ensure victims are compensated for the full amount of their losses caused by a defendant's criminal conduct. *See Hughey v. United States*, 495 U.S. 411, 420 (1990); *United States v. Robers*, 698 F.3d 937, 943 (7th Cir. 2012). The MVRA defines "victim" as any person:

> directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).[4] Courts are authorized to order restitution to persons other than a "victim" only "if agreed to by the parties in a plea agreement." *Id.* § 3663A(a)(3).

To determine whether a victim's actual losses are "directly and proximately" caused by the offense of conviction as set forth in 18 U.S.C. § 3663A(a)(2), courts look at both cause-in-fact (but-for causation) and proximate cause. *United States v. Clark*, 787 F.3d 451, 463 (7th Cir. 2015); *see also United States v. Goodrich*, 12 F.4th 219, 229 (2d Cir. 2021). Under but-for causation, a defendant's conviction must have been a necessary factor in bringing about the victim's harm. *Goodrich*, 12 F.4th at 229. For proximate cause, the harm alleged must have a "sufficiently close connection to the conduct," which is evaluated based on whether the harm was "foreseeable" to a defendant. *Robers v. United States*, 572 U.S. 639, 645 (2014); *see United States v. Donaby*, 349 F.3d 1046, 1054 (7th Cir. 2003). The government bears the burden of showing causation by a preponderance of the evidence. *See* 18 U.S.C. § 3664(e).

If determining complex issues of fact related to causation would unduly "complicate or prolong the sentencing process," the MVRA allows, but does not require, the district court to choose not to award restitution. 18 U.S.C. § 3663A(c)(3)(B). The purpose of the so-called complexity exception is to ensure that sentencing courts do not "become

---

[4] We note, "[t]he provisions of the VWPA and the MVRA are nearly identical in authorizing an award of restitution." *United States v. Randle*, 324 F.3d 550, 555 n.2 (7th Cir. 2003). "Because of the similarity of the statutory language in the VWPA and MVRA, court decisions interpreting the language of the VWPA are helpful in construing the language of the MVRA." *Id.* at 556 n.3.

embroiled in intricate issues of proof" and that the "process of determining an appropriate order of restitution be stream-lined." *United States v. Marino*, 654 F.3d 310, 317 (2d Cir. 2011) (citation omitted). The complexity exception requires a bal-ancing test: To determine whether it applies, a court "must weigh the need to provide restitution to a victim against the burden on the sentencing process posed by determining com-plex issues of fact." *United States v. Malone*, 747 F.3d 481, 486 (7th Cir. 2014).

We first address Betts's argument regarding the geo-graphic scope of the restitution award. Betts claims, and we agree, that the district court impermissibly included busi-nesses far from where Betts had reason to foresee damages being inflicted by the riot he incited.

During a hearing on August 19, 2021, the district court found that there was sufficient evidence that the riot Betts in-cited directly and proximately caused damages to the busi-nesses at Market Place Mall. We take no issue with that find-ing. Betts sent out a call for a riot at Market Place Mall at 3 p.m. That is exactly what came to pass.

Beyond the businesses at the mall, there is a question about which businesses should be included in the restitution order. The district court grappled with this question during the August 19 hearing before indicating that it would order restitution for businesses "located at the mall or on Prospect or Neil." The court ordered the government and Betts to con-fer and come to an agreement about which businesses identi-fied by the government fit within the court's geographic boundaries as previewed on August 19. Betts agreed to in-clude businesses located anywhere in the city with an address on either Prospect or Neil believing that is what the court

intended when it said restitution should include businesses "located … on Neil Street or on Prospect Avenue." Meanwhile, Betts disputed that those businesses outside of the mall that did not have an address on either Prospect or Neil should be included, regardless of their proximity to the mall, again citing the district court's order that businesses be "located … on Neil Street or on Prospect Avenue." The government, for its part, argued that any business "located in the area of the Market Place Mall and the commercial areas at Neil Street and Prospect Avenue" were within the scope of the court's August 19 order.

The court reconvened with the parties on October 15, 2021, for a hearing "to make a final ruling on the issue of restitution." The district court, addressing the disputed businesses, included those north of I-74 while disallowing those south of the highway. In so doing the district court seemed to agree with the government that any damaged businesses in the vicinity of the commercial district at the intersection of Prospect and Neil, bounded to the east by Market Place Mall and to the south by I-74, should be included in the restitution order. In our view, though it may have been permissible to draw the line elsewhere, the district court's approach was reasonable because Betts's flyer makes clear that he intended the rioters to move from the mall to the Prospect and Neil area. It is reasonably foreseeable that the rioters would damage stores in the immediate vicinity while doing so.

Upon hearing for the first time that the court would use I-74 as the boundary, Betts sought to reopen consideration of the businesses that he had agreed to because they had an address on one of the two streets—many, after all, were far from the vicinity of the Prospect and Neil intersection. The district

court denied the objection noting that "as far as [the court's] concerned, it's too late for that." Betts now challenges the district court's denial of his objection.

On appeal, the government argues that the district court had no obligation to reconsider businesses that Betts had already agreed should be within the scope of its restitution order. But Betts was right to believe that the district court had changed the parameters of its restitution order between the August 19 and October 15 hearings. At no point during the August 19 hearing did the court indicate that I-74 was a line of demarcation for the prospective restitution order. Had the court done so, Betts likely never would have consented to the inclusion of any businesses to the south of the highway, far from the Prospect and Neil intersection—a position Betts attempted to explain to the district court.

Given the changed landscape, the district court should have allowed Betts to withdraw his consent. Upon doing so, the district court then should have excluded from its final restitution order all businesses south of the highway. When Betts called for rioters to continue from Market Place Mall to the area of Prospect and Neil just to the east, he had reason to believe that the riot he incited would cause damage to businesses at or near the intersection of Prospect and Neil. What he did not have reason to foresee is that other businesses, some more than an hour's walk from the areas he drew rioters to, would be damaged. He therefore did not proximately cause the damage to those businesses.

Further, there is little evidence that Betts directly caused damage to businesses scattered throughout the city, far from the mall or the Prospect and Neil intersection. The government argues there is evidence that all businesses damaged

that day were "harmed by the riot he incited and participated in." The government reasons that rioting was unprecedented in Champaign, so the rioting that occurred anywhere in the city must have been prompted by Betts. But it is the unprecedented nature of events that calls for restraint when imposing a restitution order in this case. There were similar scenes throughout the country that weekend, many in areas where riots were equally unprecedented. Indeed, an officer that responded to the looting in Champaign agreed that the nationwide unrest was "a very unique circumstance." It is possible many people in Champaign intended to join the national unrest regardless of Betts's actions. We therefore cannot agree that Betts can be held to have directly caused damage that occurred anywhere in the city, far outside the time and places indicated on his flyer.

In some cases, after our review, we are able to order the district court to enter a specific restitution amount on remand. We are unable to do so here because the documentation that some businesses provided to substantiate their losses during the riot strikes us as insufficient. The government presented the district court with a spreadsheet of 73 businesses that apparently suffered losses. The spreadsheet included the name and address of each business, and the amount of damage each business purportedly sustained in terms of property damage and lost or stolen merchandize. But presenting a spreadsheet is not enough to establish causation on Betts's part. *See, e.g.*, *United States v. Menza*, 137 F.3d 533, 539 (7th Cir. 1998) ("[T]he government must provide the district court with more than just the general invoices submitted by [the purported victims] ostensibly identifying the amount of their losses."); *see also United States v. Ferdman*, 779 F.3d 1129, 1133 (10th Cir. 2015) (courts should not "dispense with the necessity of proof []

mandated by the MVRA and simply 'rubber stamp' a victim's claim of loss"); *United States v. Steele*, 897 F.3d 606, 614 (4th Cir. 2018) (agent testimony undercut loss estimate where the agent testified that he took victims word for it). The government is required to show that *each* identified business suffered damages because of Betts's incitement of a riot. *See, e.g., United States v. White*, 883 F.3d 983, 992 (7th Cir. 2018) ("The amount of restitution is 'limited to the actual losses caused by the specific conduct underlying the offense.'" (citation omitted)); *Ferdman*, 779 F.3d at 1133 ("Speculation and rough justice are not permitted." (citation omitted)).

FBI Agent Andrew Huckstadt, who created the spreadsheet, testified that he and other agents called several businesses affected by looting. Ultimately, many of those businesses provided the FBI with records detailing their losses and can therefore be included in the final restitution order. For example, the evidence presented to the district court included invoices submitted by TJ Maxx for work done to repair damaged property. Likewise, Old Navy provided very specific auditing results from its loss prevention activities detailing what items were stolen and the cost of those items. This is likely enough for their inclusion in the final restitution order, as both businesses are within the geographic scope of restitution.

But we are not so certain about the evidence presented by other businesses within the geographic scope of restitution. For example, Macy's sent a series of emails to law enforcement in which employees stated that the store lost $408,000 in merchandise. But, unlike TJ Maxx or Old Navy, Macy's provided no documentation substantiating or otherwise detailing its claim. The claimed losses by Macy's, and those

businesses whose documentation likewise proves inadequate, should not be included in a restitution order on remand without the district court sufficiently explaining its reasons for accepting the claimed loss amounts. *Menza*, 137 F.3d at 538 (asking district court to clarify its reasoning on remand where it provided an "inadequate explanation and insufficient reasoning as to why [it] accepted, on their face" invoices submitted by the prosecution).

We acknowledge, as we have done before, that "[d]etermining who are victims and the amount of loss are often not easy tasks for the district court." *United States v. Randle*, 324 F.3d 550, 558 (7th Cir. 2003). From the beginning, the district court recognized that there were difficult issues related to scope and a valid question about whether the people who rioted were the same people who Betts reached out to or who learned about his communications. The district court then ordered restitution because it found that Betts, in inciting, participating in, and carrying on a riot, caused damage to businesses at Market Place Mall and to businesses in the vicinity of Prospect Avenue and Neil Street north of I-74. After all, Betts's flyer noted that rioters would meet at the Market Place Mall and after, move to "the whole PROSPECT & NEIL." While the district court's finding was acceptable, it should not have included stores outside of those locations. Further, the government, as we noted above, still had to show that each business was a victim as statutorily required, 18 U.S.C. § 3663A(a)(2), because "[o]rdering restitution beyond [what a defendant] may have caused exceeds the statutory authority that Congress has given courts …." *United States v. Burns*, 843 F.3d 679, 684 (7th Cir. 2016). The government needed to do more than present the court with unsubstantiated assertions of damages from businesses. *See generally Wyatt*, 9 F.4th at 452

(no reversible error where the district court "did not simply accept the government's proposed restitution figures"); *United States v. Henoud,* 81 F.3d 484, 490 (4th Cir. 1996) (business records from the victim company and testimony of company employee sufficient to meet preponderance of the evidence). We therefore vacate the sentence regarding the amount of restitution ordered and remand for the limited purpose of reevaluating that amount based on the evidence already presented. [5]

## III

For the reasons stated above, Betts's conviction and sentence of imprisonment are affirmed. But we VACATE the sentence with regard to the restitution ordered and REMAND for the limited purpose of revaluating the amount of restitution.

---

[5] Because the government had a chance to present evidence at the sentencing and subsequent restitution hearings, we do not see fit to remand to give the government yet another chance to meet its burden by presenting new or updated evidence. *See, e.g., United States v. Fair,* 699 F.3d 508, 518 (D.C. Cir. 2012) ("No special circumstances are present that would warrant reopening the record on restitution in [defendant's] case. The government's burden to prove actual loss under the MVRA was well-established before sentencing … [t]he government was allowed to present evidence … whether the government had offered evidence demonstrating actual loss was the central issue addressed during the parties' restitution discussion at the sentencing hearing.").

HAMILTON, *Circuit Judge*, concurring in part and dissenting in part. I concur in all but one part of the majority opinion. I agree that we should affirm Betts' conviction and prison sentence and that the Mandatory Victims Restitution Act applies to Betts' conviction under the Anti-Riot Act, all for the reasons explained in the majority opinion. I respectfully dissent, however, from the portion of the opinion and judgment vacating and remanding the district court's restitution order.

The general standard is that the defendant should be ordered to pay restitution for losses "directly and proximately" caused by his offense of conviction. 18 U.S.C. § 3663A(a)(2). The factual issues were difficult here, especially given the nature of the defendant's crime. He intended to start a riot. He could not control its scope any more than an arsonist can control a fire in dry wildlands on a windy day. The harms caused were foreseeable and intended. Betts celebrated and boasted of the widespread damage.

We review the district court's factual findings for clear error and its ultimate restitution decision for abuse of discretion. See *United States v. Wyatt*, 9 F.4th 440, 452 (7th Cir. 2021). Reasonable judges could have held Betts liable for either larger or smaller sums, corresponding to either larger or smaller geographic areas, than the district court found here. I would defer to Judge Mihm's discretionary judgments on how and where to draw lines ordering restitution by Betts. I see little value in remanding to seek further refinement of those estimates and judgment calls.

Since a remand is being ordered, though, I would allow the district court to exercise its discretion to decide the scope of further proceedings and in particular whether to allow

additional evidence. Contrary to the view expressed in the majority's footnote 5, the scope of the government's burden to prove loss and causation *in a riot case*—with its prospects for widespread and uncontrollable damage—was not and still is not well established. Cf. *United States v. Fair*, 699 F.3d 508, 514 (D.C. Cir. 2012) (cited by majority, addressing government's burden to prove loss in "cases involving copyright infringement and fraudulent sales").

Finally, regarding the "complexity" exception to the Mandatory Victims Restitution Act, see 18 U.S.C. § 3663A(c)(3)(B), I would raise a threshold question: whether a convicted defendant should ever be entitled, as a matter of right, to invoke a district court's refusal to apply the exception as an error, at least in the absence of prejudicial delay. The exception was written to balance victims' interests in restitution against the burden on the judicial system of sorting out unusually complex problems, especially in time to include restitution as part of the criminal sentence. E.g., *United States v. Malone*, 747 F.3d 481, 486 (7th Cir. 2014). Any "unnecessary delay" in imposing sentence is already prohibited by the Federal Rules of Criminal Procedure. See *id.*, citing Fed. R. Crim. P. 32(b)(1). Whether to invoke the complexity exception is best left to the district court's sound discretion.

We and other circuits have previously entertained the merits of defendants' arguments claiming error based on this exception. See *Malone*, 747 F.3d at 487–88; accord, e.g., *United States v. Gushlak*, 728 F.3d 184, 192–93 (2d Cir. 2013); *United States v. Wirth*, 719 F.3d 911, 918 (8th Cir. 2013). But the complexity exception was not written to reward convicted defendants for having committed crimes in ways that make restitution unusually difficult to calculate. The opinions in

*Malone* and these other cases have not addressed the obvious moral hazard posed by entertaining such a challenge. At the same time, *Malone* and the other cases also did not actually reverse any restitution awards on a defendant's argument that he was entitled to the benefit of the exception. Before a court considers vacating a restitution award on such a theory, I hope it will first consider whether the defendant is entitled to invoke a district court's refusal to apply the complexity exception as a potential error.